651 So.2d 548 (1995)
In the Matter of the EXTENSION OF the BOUNDARIES OF the CITY OF RIDGELAND, Mississippi: City of Jackson, Mississippi
v.
CITY OF RIDGELAND, Mississippi.
No. 92-CA-00801-SCT.
Supreme Court of Mississippi.
February 23, 1995.
*549 Douglas J. Gunn, Watkins & Eager, Jackson, William F. Goodman Jr., Watkins & Eager, Jackson, for appellant.
Jerry R. Wallace, Wallace & Associates, Ridgeland, Jerry L. Mills, Pyle Dreher Mills & Dye, Jackson, for appellee.
Before HAWKINS, C.J., and JAMES L. ROBERTS, Jr. and SMITH, JJ.
SMITH, Justice, for the Court:
The Mayor and Board of Alderman of Ridgeland (Ridgeland) at their regular meeting on May 1, 1990, adopted an ordinance extending and enlarging the corporate limits of the city. The Board of Directors of the Pearl River Valley Water Supply District voted unanimously to approve Ridgeland's proposed expansion, provided the District would retain exclusive jurisdiction over the adoption and enforcement of the land use development policy, zoning, the water/sewer and waste disposal systems, and other such matters. The District withheld approval of the annexation in areas around the Reservoir which excluded several subdivisions and the Jackson Yacht Club.
In June of 1990, the City of Ridgeland, Mississippi, filed a petition for annexation in the Chancery Court of Madison County. Ridgeland sought to annex 6.8 square miles consisting of two separate tracts, one to its east and one to its west. The City of Jackson, (Jackson) appellant herein, filed a written objection to the proposed annexation. Jackson alleged that the attempted annexation was unreasonable as unnecessary to *550 Ridgeland and permanently detrimental to Jackson's path of growth.
Chancery Judge George Warner was appointed by this Court as Special Chancellor to preside in this case after the Madison County chancellors recused themselves.
Ridgeland presented its case beginning on June 15, 1991. Thereafter, Jackson's motion to exclude Ridgeland's evidence and to dismiss was for the most part, denied. Jackson presented its case, relying primarily upon this Court's decision in Matter of Boundaries of City of Jackson, 551 So.2d 861 (Miss. 1989). Jackson's renewed motions to exclude and to dismiss were denied. On June 25, 1992, Chancellor Warner ruled the annexation of the majority of the area sought by Ridgeland was reasonable and would be approved. Such partial approval is specifically authorized under Miss. Code Ann. § 21-1-33 (1972).
Jackson perfected its appeal to this Court on August 6, 1992, again primarily relying on Matter of Boundaries of City of Jackson, arguing that the chancellor should have undertaken a "heightened scrutiny" and that the "substantial adverse impact on Jackson mandates reversal." Further facts are presented as necessary. Five issues for review are submitted:
I. WHETHER OR NOT THE LOWER COURT'S DETERMINATION THAT THE ANNEXATION WAS REASONABLE WAS ERRONEOUSLY GROUNDED ON LEGAL CONCLUSIONS WHICH MISSTATE THE APPROPRIATE LEGAL STANDARD IN ANNEXATION CASES.
II. WHETHER OR NOT THE LOWER COURT CORRECTLY APPLIED THE STANDARD OF CITY OF JACKSON V. CITY OF RIDGELAND, 551 So.2d 861 (Miss. 1989) TO RIDGELAND'S ANNEXATION.
III. WHETHER OR NOT THE LOWER COURT ERRED AS A MATTER OF LAW IN FAILING TO EXAMINE THE CONTRIBUTION OF JACKSON TO RIDGELAND'S GROWTH IN EVALUATING WHETHER THE NEED TO EXPAND AND PATH OF GROWTH INDICIA WERE MET.
IV. WHETHER OR NOT THE LOWER COURT ERRED IN FINDING THAT RIDGELAND HAD A NEED TO EXPAND WHEN THE PROPOSED ANNEXATION DOES NOT MEET THIS PROFESSED NEED TO EXPAND.
V. WHETHER BASIC PRINCIPLES OF EQUITY, FAIRNESS AND PUBLIC POLICY, AS IDENTIFIED BY THIS COURT, REQUIRE REVERSAL OF THE LOWER COURT RULING.
Under the standard of review applicable to annexation cases, the lower court committed no reversible error. The chancellor applied the correct standards and reached a result supported by the record. As the record contains no manifest error, this Court affirms the decision approving the majority of the areas originally sought to be annexed.

DISCUSSION

I. WHETHER OR NOT THE LOWER COURT'S DETERMINATION THAT THE ANNEXATION WAS REASONABLE WAS ERRONEOUSLY GROUNDED ON LEGAL CONCLUSIONS WHICH MISSTATE THE APPROPRIATE LEGAL STANDARD IN ANNEXATION CASES.

II. WHETHER OR NOT THE LOWER COURT CORRECTLY APPLIED THE STANDARD OF CITY OF JACKSON V. CITY OF RIDGELAND, 551 So.2d 861 (Miss. 1989) TO RIDGELAND'S ANNEXATION.
Jackson contends that the chancellor erred in application of the twelve indicia of reasonableness which this Court has set forth as a guide to chancellors' consideration of annexation cases. Jackson argues that a consideration of the last of the traditional twelve indicia of reasonableness, the indicia of "other factors affecting reasonableness," must be accorded greater weight than the *551 remaining indicia. Further, Jackson suggests a heightened scrutiny of the proposed annexation must be undertaken such that annexation should be disallowed unless a city can demonstrate a clear, "overriding need" to annex the areas sought. Jackson contends that consideration of the "other factors" in this case, and most significantly the "substantial adverse impact" on Jackson, mandates reversal. Jackson's entire argument is based on this Court's decision in Matter of Boundaries of City of Jackson, 551 So.2d 861 (Miss. 1989), (hereinafter, "City of Jackson"). Jackson contends Chancellor Warner's failure to apply this Court's conclusion that the "other factors indicia," was of "greatest significance," requires reversal.
This Court has stated:
In a series of cases beginning with Dodd v. City of Jackson, 238 Miss. 372, 396-97, 118 So.2d 319, 330 (1960) down through most recently McElhaney v. City of Horn Lake, 501 So.2d 401, 403-04, (Miss. 1987) and City of Greenville v. Farmers, Inc., 513 So.2d 932, 941 (Miss. 1987), we have recognized at least eight indicia of reasonableness. These include (1) the municipality's need for expansion, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) the potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, and (8) the past performance and time element involved in the city's provision of services to its present residents.
Other judicially recognized indicia of reasonableness include (9) the impact (economic or otherwise) of the annexation upon those who live in or own property in the area proposed for annexation; Western Line [Consol. v. City of Greenville, 465 So.2d 1057, 1059 (1985)]; (10) the impact of the annexation upon the voting strength of protected minority groups, Enlargement of Boundaries of Yazoo City [v. Yazoo City, 452 So.2d 837 at 842-43 (1984)]; (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and for the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy the (economic and social) benefits of proximity to the municipality without paying their fair share of the taxes, Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686, 689 (Miss. 1971); Forbes v. Mayor & Board of Alderman of City of Meridian, 86 Miss. 243, 38 So. 676 (1905); and (12) any other factors that may suggest reasonableness vel non. Bassett v. Town of Taylorsville, 542 So.2d 918, 921 (Miss. 1989).
In the Matter of the Enlargement and Extension of the Municipal Boundaries of the City of Madison, Mississippi: The City of Jackson, Mississippi v. City of Madison, 650 So.2d 490 (Miss. 1995) (hereinafter, "City of Jackson v. City of Madison"): In the Matter of the Extension of the Boundaries of the City of Columbus, Mississippi: Kenneth R. Robinson, Walter J. Cunningham, Ralph Edward Hall, J.B. Wilkins, Arnette Neil Beard, and Ed Markham v. City of Columbus, Mississippi, 644 So.2d 1168 (hereinafter, "City of Columbus"); City of Jackson, 551 So.2d at 864; See also, Bassett v. Town of Taylorsville, 542 So.2d 918, 921-22 (Miss. 1989).
Chancellor Warner issued a lengthy opinion centered around the traditional twelve indicia of reasonableness and focusing particularly on this Court's opinion in its then most recent annexation decision of City of Jackson. The chancellor clearly understood the standard to be applied in this annexation matter and his task of looking at the "totality of the circumstances." As to Jackson's argument before this Court that the decision in City of Jackson somehow changed the standard in annexation cases, the chancellor wrote:
The excellent attorneys representing Jackson, in essence, have told this court that our Supreme Court has said, in the afore cited case, "whatever Jackson want, *552 Jackson gets." Naturally, the attorneys for Ridgeland disagree.
* * * * * *
Again, quoting Justice Robertson: "This is not an ordinary annexation case. Much more is at stake ... We must decide whether Mississippi's largest and Capital City, already landlocked by a plethora of bedroom communities, will have another nail driven in the coffin, which, if closed, will doom it to the fate already experienced by so many central cities around the nation. It is patently unreasonable that this should occur." Beautiful prose, but in that case, Jackson held the white pawn and made the first move. I cannot find that our Court intended anything other than the annexation sought by Jackson was proper. I cannot believe that our Court attempted to enter the Legislative field by defining and declaring that our Capital City can call all the shots, in all the areas, forever  if those areas are anywhere near the City of Jackson. Our law doesn't say that. There is nothing in any statute which places big above little, or vice-versa. The same right afforded Jackson is granted to Podunkville, however few inhabitants it may have.
It appears the chancellor correctly interpreted Jackson's argument, the same one now advanced in this Court. In its reply brief, Jackson states: "Jackson does not contend that Ridgeland or any other suburban city should never be entitled to annex again. It does not assert "Capitol City Supremacy... ." However, arguing that the standard in this annexation case is different, Jackson in the very next breath asserts: "Because of the importance of the City of Jackson, as capital city to this state, and as central city to this metropolitan area, this Court held that further constriction of its boundaries should be limited to those situations where some compelling need or reason exists under the totality of the circumstances."
The chancellor applied the correct standard of reasonableness under the totality of the circumstances. A reading of his entire opinion also gives one the clear impression that he sought to apply the law evenhandedly, with no favoritism toward Jackson, the capital city, and much larger neighbor of "little Ridgeland." Put another way, the chancellor exhibited a concern for "fairness" toward both cities and the inhabitants of the annexation areas, just as this Court recently reemphasized that fundamental principle:
Only by reviewing the annexation from the perspective of both the city and the landowner can the chancellor adequately determine the issue of reasonableness. In short, the common thread that must run through any reasonableness criteria is fairness. An unreasonable annexation is an unfair one and, as fairness is the foundation of equity, an annexation cannot be both unreasonable and equitable. The converse is equally true for an annexation cannot be both inequitable and reasonable.
City of Columbus, 644 So.2d at 1172-73, citing Western Line, 465 So.2d at 1059-60. (emphasis in original).
The standard in annexation cases has not changed and the correct one was cited and applied herein. Essentially, the chancellor did exactly what Jackson is asking, i.e., he placed great importance on the impact of this annexation upon Jackson. A concern for reasonableness and fairness is demonstrated throughout the chancellor's opinion and he certainly was aware of this Court's prior determination that Jackson's path of growth, should Jackson ever become ready and able to move forward, must not be cut off. Issues I and II are without merit.

III. WHETHER OR NOT THE LOWER COURT ERRED AS A MATTER OF LAW IN FAILING TO EXAMINE THE CONTRIBUTION OF JACKSON TO RIDGELAND'S GROWTH IN EVALUATING WHETHER NEED TO EXPAND AND PATH OF GROWTH INDICIA WERE MET.

IV. WHETHER OR NOT THE LOWER COURT ERRED IN FINDING THAT RIDGELAND HAD A NEED TO EXPAND WHEN THE PROPOSED ANNEXATION DOES NOT MEET THIS PROFESSED NEED TO EXPAND.
*553 Annexation is a legislative affair. The judicial function is limited to the question of whether the annexation is reasonable. City of Jackson, 551 So.2d at 863; City of Jackson v. Town of Flowood, 331 So.2d 909, 911 (Miss. 1976); Ritchie v. City of Brookhaven, 217 Miss. 860, 870-73, 878, 65 So.2d 436, 439-40, 65 So.2d 832, 833 (1953). This Court has frequently reiterated its position that the factors to be considered are not to be treated as separate, independent tests but rather indicia of reasonableness, and that the ultimate determination must be whether the annexation is reasonable under the totality of the circumstances. City of Columbus, 644 So.2d at 1172-73; See Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d 814, 819 (Miss. 1991); Matter of Boundaries of City of Vicksburg, 560 So.2d 713, 716 (Miss. 1990); In re Enlargement of Corporate Boundaries of the City of Booneville, Prentiss County, Mississippi, 551 So.2d 890, 892 (Miss. 1989); City of Jackson, 551 So.2d at 864; Bassett v. Town of Taylorsville, 542 So.2d at 921-22.
In reviewing the proposed annexation, the chancellor was required to determine reasonableness under the totality of the circumstances. To that end, although Jackson challenges the findings of the chancellor on only six of the twelve indicators of reasonableness, a review of the entire list is presented so that the challenges may be viewed within the context of all of the factors which the Chancellor considered.

Standard of Review
As the chancellor employed the correct legal standards, this Court's standard of review is limited. This court reverses the chancellor's findings regarding reasonableness of the annexation only if the chancellor is manifestly wrong and his findings are not supported by substantial credible evidence. City of Jackson v. City of Madison, 644 So.2d 860; Matter of Confirmation of Alteration of Boundaries of City of Horn Lake, Miss. and the City of Southhaven, Miss., 630 So.2d 10 (Miss. 1993), citing Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d at 819.
Ridgeland points out, correctly, that the chancellor was taken on a tour of the areas concerned by attorneys from both Jackson and Ridgeland and this inspection of the area adds weight to his findings of fact. This Court recently stated:
This Court has no basis on which to reverse the Chancellor's opinion as to reasonableness... . Where there is conflicting evidence, this Court must give great deference to the fact finder. The Chancellor heard the evidence first hand and had the invaluable benefit of inspecting the areas. Under our limited standard of review, this Court must affirm the Chancellor's decision.
Matter of Enlargement of Corp. Limits of Hattiesburg, 588 So.2d at 826.
Jackson asserts that this Court is no longer limited to its familiar "manifest error/substantial evidence" rule in this matter since the chancellor himself did not apply the correct legal standard in rendering judgment. Jackson concludes that this Court may thus conduct a de novo review of the chancellor's findings. As discussed in the previous assignments, the chancellor cited and applied the correct standard of law. Because the Chancellor applied the correct legal standard, the standard for this Court's review requires affirmance unless the Chancellor committed manifest error or unless the record lacked substantial evidence to support his conclusion. Id. at 826-27.

Need to Expand
Ridgeland contends several factors support its definite and present need to expand: population growth, increased new building permit activity, lack of availability of land to meet increasing development, rate of consumption of available land by development, and need to expand the city's borders to exercise control over development and to provide comprehensive planning for growth.
The population of Ridgeland grew 230% between 1970 and 1980 and another 114% between 1980 and 1990. In 1970 Ridgeland had a population of 1,650 persons compared to 11,714 in 1990. The area which Ridgeland sought to annex included an additional 1,019 persons. These figures demonstrate a *554 steady and dramatic upward trend in population growth beginning in 1970. Ridgeland's growth ranks it number two (2) in percentage of growth of cities statewide.
Ridgeland demonstrated a corresponding increase in applications for single family building permits, with a 309% increase in the five year period from 1987 until 1992. Ridgeland submits that residential land available for such development "is so scarce that subdivision developers conduct lotteries to sell subdivision lots."
Jackson does not contest the figures presented by Ridgeland, but submits that the reason for the growth of Ridgeland should be an important, perhaps the most important consideration. Jackson argues that the admittedly "rapid" growth of Ridgeland is attributable for the most part to its proximity to Jackson with a resulting spillover of Jackson's growth into Ridgeland. Jackson contends that Ridgeland thus has no need to expand due to any growth of its own. For example, Jackson argues the decrease in its population by 6,258 persons from 1980 to 1990 is not simply coincidental with Ridgeland's growth by 6,253 persons during that same period. Jackson further argues it is unreasonable for Ridgeland to exclude every acre of flood plain land existing in Ridgeland as "undevelopable." Ridgeland concedes some flood plain areas could be developed at a greater expense.
As support for its position, Jackson cites Ridgeland's admission that it has profited from its proximity to Jackson, in attracting both new residents and new businesses. Similarly, Jackson argues that a city the size of Ridgeland could never have attracted a development such as Northpark Mall were it not for the proximity of Jackson and its many shoppers. Ridgeland counters that Jackson was unable or unwilling to accommodate the developers of such commercial projects as is further evidenced by the fact that the original proposed location of the mall, in Jackson, remains vacant today.
The chancellor found that Ridgeland certainly demonstrated a clear need to expand:
Back in 1958 Spencer Tracy gave one of his most memorable performances in "The Last Hurrah." It was the last chance for a politician. He tried to step aside and history passed him by. Look at the maps and you will see that if we consider, as the prior case [City of Jackson, (1989)] did, Jackson's growth path in this area being to the north and northwest, then this may be Ridgeland's last hurrah. If this Court nails shut the coffin now, Ridgeland has reached maturity and can expand only within  never without.
Extensive testimony by Joseph Lusteck, an urban planner and real estate consultant, supported the proposition that Ridgeland had demonstrated a need to grow. He stated the city's development plans, when compared with existing conditions, left it on the "weak side" in terms of residential development space. Lusteck testified that the majority of Ridgeland's current population lived in apartments, and an increasing need for single family residential land was occurring. He stated the southeast and north central parts of the city were essentially "built out" for this use. Michael Bridge, expert urban planner, also stated that a city must be able to provide a variety of residential land types to its residents. Lusteck stated in west Ridgeland, "spillover" development had occurred into the western annexation area. Ridgeland sought to annex that land, already committed to use as single family residences. Lusteck estimated 537 units existed in the western area and about 85 in the eastern annexation area. He stated a total of 772 vacant, developable acres existed in the annexation areas. Of the total 6,873 acres in the current Ridgeland limits, 3,292 consisted of vacant, developable land. Of the remaining 3,581 acres, 3,048 were developed and in use, and 533 were undevelopable. Testimony from Corrine Fox, Jackson's planning and engineering consultant, did not contradict these figures. Rather, Fox stated Ridgeland had 3,206 acres vacant, some of which included flood plain land. She stated 48.4% of Ridgeland land was currently vacant. She stated her opinion that development can occur in a flood plain if restrictive ordinances are enforced. Fox predicted it would take 10.5 years for Ridgeland to use the remainder of its developable land if current growth rates continued. However, she agreed with Ridgeland's experts *555 that rarely will a city become 100% "built out," and that it would be likely that Ridgeland would become built out in 7.9 years by developing 75% of its remaining vacant land.
Lusteck testified that a city should generally be looking at expansion when it is two-thirds built out, and to expanding when it is three-fourths built out. Lusteck stated Ridgeland had not reached that point, but was growing "much faster" than the typical city. On rebuttal, Lusteck testified if one used the average rate of absorption of developable land in Ridgeland from the past 5 1/2 years, 242 acres per year, Ridgeland would develop 75% of its remaining land in 2.8 years. His observation that single family residential development absorbs a much larger amount of land than apartment development supported this conclusion. Lusteck explained that Fox reached her estimate of 7.9 to 10.5 years by subtracting developed land from developable land and multiplying by 75%; he contended this figure would work out to 90.6% build out, not 75%.
Similar testimony came from Michael L. Bridge, accepted as an expert in urban and regional planning. He stated growth in Ridgeland was "unprecedented," with Ridgeland having the second highest population growth in the entire state for municipalities between 1980 and 1990. He stated careful consideration was given to the proposed areas of annexation, and that Ridgeland ultimately chose to annex a much smaller area than originally contemplated "to make sure that they can fulfill the promises as set forth in the ordinance."
As to Jackson, Bridge stated "nothing is happening" in the area annexed by Jackson in 1986, finally affirmed by this Court in 1989 in City of Jackson. In fact, the area experienced a population decline according to the 1990 census. Bridge described services to the 1989 Jackson annexation area as "minimal or cosmetic in nature, with no significant improvements." Therefore, he reasoned, it was best for both the residents of the current proposed area and Ridgeland for Ridgeland to pursue this annexation. Finally, Bridge stated that Jackson used a different standard than he did to measure developed land, in use; Bridge estimated if Jackson's standard were applied to Ridgeland, it would show Ridgeland was 63-65% developed at present. Bridge added that Ridgeland has a good deal of acreage "being held off the market" by developers, which Ridgeland cannot use.
Further review of the chancellor's opinion demonstrates he always kept in mind the overall considerations of fairness and reasonableness to both cities:
I read and see evidence of a recession most everywhere. Someone forgot to tell Ridgeland. Someone forgot to tell the Jackson City Planner who said, "Ridgeland is not growing." Bull! Business appears to be booming. Vacant stores are almost nonexistent. New commercial buildings have sprouted in every grove of trees  office, sales and service. The new homes under construction were and are a shock when seen for the first time.
My tour moved to the east  to the established condos and marinas and homes that thrive and exist on and "off of" the Barnett Reservoir. This growth adjoining the reservoir is one area sought to be annexed, with the exception of the Jackson Yacht Club which was excluded during the trial. Part of this area is completely unreasonable and unnecessary to the City of Ridgeland... . This is the area occupied by the Water Treatment Plant and the area nearby. The testimony convinced the Court that Ridgeland had no claims nor need for this area and plant, other than itchy palms and greedy claws.
My tour went to the west to the area west of I-55 which Ridgeland seeks to annex. I haven't seen that many huge, beautiful, expensive, and new homes anywhere, except on the island of Oahu in Hawaii. Citizens representing these Mansion Magnets came to court and begged to be annexed into Ridgeland. (Some of them candidly said in so many words "We prefer Ridgeland to Jackson," but Jackson has not filed for any annexation in this area  and indicated such action would be up to a dozen years hence).
The cities' arguments leave this Court with no basis to find the chancellor was manifestly in error in finding Ridgeland proved its need *556 to expand. Although Jackson is somewhat convincing in arguing that some of Ridgeland's growth is due to its proximity to Jackson, it cannot deny the fact of Ridgeland's growth. Essentially, Jackson does not address these questions of whether Ridgeland has a need to expand, but concentrates its argument on why such a need has developed.
Joseph Lusteck testified the current annexation would leave Jackson with 75.2 square miles adjacent to it into which it could grow. He stated Jackson could thus reasonably expand to the southwest, north and northwest. He noted Jackson's proposed annexation of Byram evidenced Jackson's intent and ability to move to the south. Further, Lusteck indicated that he advised Jackson Mayor Danks in 1988 that Jackson should expand to the southwest. Lusteck further testified: "The expansion of the City of Ridgeland would have a very minimal impact on the potential for Jackson to make decisions in the future," particularly in the eastern annexation area, where "there is no route of access to it from Jackson."
Ridgeland presented substantial evidence of its need to expand and also demonstrated Jackson was left with the ability to expand to the northwest and southwest. The chancellor's finding that Ridgeland demonstrated a need to expand was supported by the evidence.

Path of Growth
Ridgeland submits the proposed areas of annexation are certainly within its natural path of growth as evidenced by their locations, accessibility, a spillover of urban development from Jackson, and the fact that it has invested in infrastructures to extend utilities and transportation systems to the annexed areas. The Mayor of Ridgeland, Gene McGee, testified the proposed areas were chosen only after the Board of Alderman hired planning experts to study the situation and advise Ridgeland on the areas into which it should expand and could reasonably serve. That process involved six to eight months of planning meetings.
As can be seen from a map depicting Ridgeland as it exists and the areas to be annexed, there is no question that the proposed areas are directly adjacent to Ridgeland to its east and west borders. Further, as the chancellor pointed out, in this matter the "question, of course, is `Ridgeland or nothing.' It is important to remember it is not whether the western area, (or perhaps even the eastern area) will be taken into Jackson; it's whether it will be taken into Ridgeland."
Ridgeland notes the eastern tract has a total of 3.3 square miles, 1.6 of which are water. As to accessibility, Ridgeland further notes it provides the only access to the reservoir area from the south while there are no roads connecting the eastern annexation area with Jackson. Mayor McGee stated the Ridgeland police were "regularly called upon" to look into DUIs and other traffic concerns resulting from people travelling from the reservoir establishments to Ridgeland and Jackson destinations. Likewise, in the Spillway Road area, there was heavy traffic and continued maintenance due to the use of the road by citizens from other areas. Ridgeland argues the significant commercial development due to the attraction of residents to the reservoir area has increased the need for law enforcement, rescue and fire services handled by Ridgeland. Ridgeland was also responsible for securing an EPA grant to transport sewage from the eastern annexation area to a regional sewer interceptor.
The western area contains roughly 3.4 square miles and 1,109 residents. Of the land, 622 acres of vacant developable land exist. Ridgeland asserts this land is within its path of growth since it abuts an area annexed by Ridgeland in 1988 which has now "grown out" and begun to spill over into the proposed annexation area. Mayor McGee testified that subdivisions such as Dinsmor and Windrush did not develop until the 1989 annexation by Ridgeland, when the city provided sewer and water services. The mayor stated a "tremendous amount of interest" had since occurred in the area and development had begun to spill over to the west as a result. Finally, as to further investment in infrastructures, Ridgeland cites its contributions to Highland Colony Parkway, a major four-lane, curb-and-gutter boulevard. Ridgeland *557 notes Jackson failed to contribute anything other than a traffic signal at an intersection of the parkway and a street within Jackson's city limits.
Jackson responds first that it is not clear whether the chancellor ever considered this factor. It is certainly true that regarding the first two indicia of reasonableness, the chancellor's analysis is not organized as clearly or as succinctly set forth as are the remaining factors; however, he clearly does address both "need to expand" and "path of growth" issues, sometimes intermingling the two. The Chancellor stated:
They cannot go South, for there lies Big Brother. They cannot go east, other than to swim a reservoir they could never develop. They cannot go north unless they absorb Madison. They don't have growth paths, there is only one path  west. Jackson objects to any westward movement, but really what Jackson is saying is: "You are big enough, little brother; you can't grow any more."
Again, Jackson concentrates on attacking the cause of Ridgeland's growth and relies on this Court's decision in City of Jackson. Jackson argues that there can be no annexation permitted within Jackson's "judicially-recognized path of growth to the north" absent a finding that the annexing city establishes clear proof on "path of growth." Connie Cooper, a city planning consultant, testified that the basis of her opinion that it was unreasonable for Ridgeland to annex the proposed areas was the impact on Jackson  a "tremendous amount of growth" was occurring in those areas and the current annexation by Ridgeland would "deny Jackson the opportunity to include this area in its corporate limits at some time... ." At every turn where Ridgeland submits evidence supporting its need to expand and the direction of its path of growth, Jackson simply claims credit while at the same time denying that Ridgeland has supported its case. For example, Jackson states the eastern annexation area is actually Jackson's path of growth, but not Ridgeland's, because Jackson over the past years since the construction of the Barnett Reservoir has contributed the bulk of the ad valorem taxes.
A review of the chancellor's opinion indicates his keen awareness of this Court's 1989 City of Jackson annexation decision. Therein, the Court proclaimed, "[n]o doubt the hour is late, but Jackson's path of growth to the north and northwest simply must not be further constricted. We must leave open Jackson's door to the future." 551 So.2d at 868-69. In fact, Chancellor Warner centered his entire analysis around the 1989 case, as can be seen from extensive references and quotes throughout his opinion:
Much of the law this court is obligated to follow involves the same two parties, and was rehashed in the recent case of Matter of Boundaries of City of Jackson. This judge has read and reread that case in connection with the facts of this case.
* * * * * *
The Court finds as patently unnecessary to the City of Ridgeland that portion of the proposed annexation to the east lying south of the intersection of the center line of Section 33, and the present existing eastern boundary of City of Ridgeland. The Court thereby excludes from the proposed annexation all land south of the intersection of the centerline of Section 33 and said center line extended eastward through the center line of Section 34 and continuing eastward to the Pearl River or the boundary of the proposed annexation, which includes Jackson Water Treatment Plant. This area was excluded on the MCRP 41(b) Motion, leaving Jackson's growth corridor north open.
Keeping in mind the criteria in the seminal case being used, as pronounced by the Supreme Court, and keeping in mind Jackson's need to grow, the Court believes Livingston Road and its fork to the north, being Castle Road, provide the only north/south artery anywhere near the proposed annexation area, which is not already within the confines of either .. . city. The City of Ridgeland proposed to annex Livingston Road's intersection with Old Agency Road. This is a prime commercial area. There could be no other reason which would rise to the level of "reasonableness" for the proposed extension of Ridgeland's city limits in that area. The Court believes this is *558 unreasonable, as it will eliminate one of Jackson's north/south arteries, which is not needed by the City of Ridgeland at all.
There is no doubt the chancellor considered Ridgeland's path of growth, primarily to its west, and Jackson's path of growth as detailed in the 1989 decision. Mayor McGee testified there was no other direction to either the east or the west available for Ridgeland to grow. The mayor stated Jackson was left with room to expand to the northwest and to the south and southwest. The mayor did concede some of Ridgeland's growth is related to its proximity to Jackson, but also stated Ridgeland had helped itself through aggressive planning and development. Supporting the chancellor, the mayor testified the affect of this annexation on Jackson was considered, but it was his opinion that Jackson would be unable to provide services to the areas in question in the foreseeable future.
The chancellor observed during the proceedings:
The only thing before the Court is whether or not the annexation by the City of Ridgeland is reasonable or unreasonable. Jackson has made no move to annex, there has been no annexation filed by the City of Jackson. There is no request to annex by the City of Jackson. The only objection made by the City of Jackson, as I understand it, is that this area is in its growth pattern, however long the growth may take for the City of Jackson to come up with the idea or the desire to annex the area... .
Expert urban planner Michael Bridge expressed the opinion that to attribute any of the residential or commercial growth in the annexation areas to Jackson "would be in error." He stated growth occurred in the metropolitan area since 1980 but was not also occurring within the City of Jackson. Joseph Lusteck, urban planning consultant, testified that it is clear that urbanization does not end at Ridgeland's present boundaries. For example, seventeen new homes were built between 1990-92 in the western annexation area. The same "path of growth indicators" cited by the chancellor were described in detail by urban and regional planning expert Michael Bridges, also supporting the reasonableness of Ridgeland's proposal. No manifest error is indicated in the chancellor's findings.

Potential health hazards
As to this factor, the chancellor simply stated: "I cannot find any potential health hazards that would not be better with these areas being in the City."
Jackson asserts the failure of the chancellor to set forth the basis for his finding, or at least to identify any potential health hazards he may have found, indicates this indicium was not properly applied.
Ridgeland states the existence and use of septic tanks, testified to during trial, is certainly a potential hazard. Ridgeland further cites open dumping of garbage and standing water in the eastern area as other hazards. Ridgeland stated it proposes to eliminate these health hazards "through enforcement of its regulatory codes and extension of its utility systems." Mayor McGee testified that Ridgeland's sewage is treated in Jackson, but as to solid waste, Ridgeland had contracted with Waste Management Company. Joseph Lusteck noted that a comparison of Jackson and Ridgeland showed septic tanks were in use for the equivalent of roughly 1% of each city's residents. Michael Bridge testified Ridgeland's plan included mosquito control in both annexation areas, which was not currently provided by any agency, and which was needed as a health hazard prevention step.
Evidence adduced at trial supports the chancellor's finding on this factor of reasonableness of the annexation. Though Jackson argues the chancellor might have explained his finding in greater detail, Jackson offers no evidence of potential health hazards.

Financial Ability to Provide Promised Services
The chancellor found:
Heck, they could quit collecting money, cut services by 9 percent and make it through the following year with a zero income and still provide all they provide. There is no doubt of the city's financial *559 ability to make any improvements needed and furnish municipal services in these area[s].
Jackson does not address this indicium of reasonableness. Ridgeland noted that, as of May 1992, its unencumbered cash reserves totalled $5,200,000. Ridgeland states there was "no contest" over its financial ability at trial.
Trial testimony indicated this factor was clearly an indication of the reasonableness of Ridgeland's proposal. Joseph Lusteck testified fiscal projections for 1992-97 showed Ridgeland capable of funding services, through normal budgeting procedures, for both the existing and annexed territories. He stated for 1992, for example, a "budget of less than 10 Million dollars with 5.6 [sic] Million Dollars in reserves after operations, is virtually unheard of." No manifest error is indicated.

Zoning and Planning

Municipal Services
Again, the chancellor simply found: "[T]he areas will benefit from municipal zoning and planning, and municipal services in these area[s]." Jackson argues the chancellor's failure to elaborate upon these factors indicates that the standard was incorrectly applied. More specifically, Jackson submits the issue is not merely whether the proposed annexation areas would benefit from the annexation, but whether a need for municipal zoning and overall planning was evidenced.
Ridgeland responds that the proposed areas are currently covered by the Madison County Zoning Regulations Ordinance, but contends its own zoning and development regulations are "superior." Ridgeland notes its regulations were designed with urban development in mind. Ridgeland argues the proof certainly showed a need for zoning and overall planning in the areas in order to combat problems associated with unregulated growth and incompatible land uses. As to the need for "overall planning" in the annexed areas, the chancellor noted Jackson appeared to be using an inconsistent argument on this issue:
I'm trying to understand the significance of the question about "Is Ridgeland undergoing uncontrolled growth," and corresponding that to the attempting to annex an area to control growth. It seems like the city would be chastised for allowing uncontrolled growth and chastised for trying to annex the area to control growth.

Testimony concerning the need for municipal services included statements by Mayor McGee. He testified that in the eastern area, the requests for water and sewage service were already handled by Ridgeland and the Pearl River Water District. Ridgeland provides the transportation services which allowed Pearl River Water Supply District to provide the sewer services. Water and sewer services were also provided by Ridgeland in the western tract, allowing subdivisions such as Hillview to be constructed.
The only testimony of Jackson contrary to Ridgeland's proof was that ultimately, increased use of the sewage discharge into the lines leading to Jackson's treatment plant could lead to overload. However, Mayor McGee stated in that event, cities would be required to reduce their flow or to work out some type of corrective action. Jackson's engineering and public works expert, Ted Sommers, admitted that part of the cost of Jackson's sewage treatment plant was being paid off by customers throughout the metro area, including Ridgeland. Further, Ridgeland paid the bill for two of the interceptor lines. Also, Ridgeland, like Jackson, will eventually have to discontinue reliance on groundwater and provide for other means of potable water.
Former Jackson Chief of Police and current Ridgeland Chief of Police Charles Newell stated the Ridgeland police force at the time of the trial had twenty eight officers with three more to be hired. He stated a plan to provide law enforcement to the annexation areas would create two new patrol zones, for a total of four such zones. Projections called for an increase in manpower requiring the hiring of twelve additional officers. Chief Newell testified Ridgeland at the time of trial already serviced these proposed annexation areas with a back-up response team, when requested by the Madison County *560 Sheriff's office. From interviews with individuals arrested for DUI, the Ridgeland police had learned that about 90% of the arrested persons had been to a bar or club in the reservoir area; most traveled from there down the Spillway road and through Ridgeland prior to being arrested.
On cross-examination, the chief admitted the new officers would be phased in over a four-year period. However, he testified if Ridgeland added no new officers, its ratio of law enforcement officers to citizens would still be higher than that of Jackson. Joseph Lusteck's testimony supported this statement; he testified typical cities have a ratio of two to two and one half officers per thousand citizens and that Ridgeland already exceeded that ratio.
Testimony supported the chancellor's findings on this indicium. As Jackson readily admits, the chancellor is not required to fully elaborate the basis for each of his findings where evidence at trial exists as support.

Natural Barriers
The chancellor found: "There is no natural barrier as Ridgeland is on both sides of I-55... ." Again, Jackson does not request review of the chancellor's finding on this factor; presumably there would be no basis for doing so as it seems clear from a review of the testimony at trial and maps portraying the accessibility of Ridgeland to the annexation areas that no natural barriers exist.

Past performance
The chancellor determined that Ridgeland's "performance in past annexations clearly cannot be said to be unreasonable." Ridgeland was last involved in an annexation matter in City of Jackson, in which this Court determined Jackson's annexation proposal was most reasonable.
Testimony from Mayor McGee noted that in the area comprising the prior annexation, including such subdivisions as Dinsmor, Old Agency Village, Bear Creek area, and St. Andrews school, Ridgeland had installed water and sewer services. Also, one road, Steed Road, was being reconstructed in the area, and construction of Highland Colony Parkway had begun with an estimated completion date of Fall 1992. Further, Ridgeland had purchased the Bear Creek Water Association area and was in the process of adding a new, million gallon ground water tank with new service lines at a cost of about $800,000.
The mayor admitted one area with less than twenty residents, annexed in 1980, currently had no sewage line and only two-inch water lines. He stated fire protection there currently meant bringing water in though trucks, but that the current administration had applied for a community development grant to improve the situation.
Ridgeland submits it has "a good record of keeping its promises" to its residents and adds that Jackson introduced no evidence to the contrary. This being supported in the record, there was no manifest error in the chancellor's finding.

Economic, other impact on property owners
The chancellor detailed his findings as follows:
The economic impact was covered in reams of paper work, mountains o exhibits, and dictionaries full of words. Yet no one seriously doubted the financial stability of Ridgeland  a city with approximately $7,000,000 surplus, and probably unique in the cities of this state and America, in that it has lowered taxes for several years, lowered its water rates, and finishes its fiscal year with 91 percent of next year's budget in the bank.
Ridgeland asserts no evidence of adverse impact to taxpayers or residents of the areas was put before the chancellor. The most significant point for consideration of this factor, however, would be the undeniable fact that there was not a single resident of either area of proposed annexation who appeared to object to Ridgeland's proposal. Further, the chancellor specifically noted that citizens occupying the western area actually "came to court and begged to be annexed into Ridgeland." The record supports this finding. Exhibits P-4, P-5 and P-6, introduced during *561 Mayor McGee's testimony, contained petitions from residents of the western annexation area, requesting annexation by Ridgeland. Prior to opening statements by counsel for the cities, the chancellor allowed interested citizens to make statements; thirteen did so, all requesting annexation by Ridgeland.
Representative comments included, "it just makes sense that we should be in Ridgeland" and, "Ridgeland has been very accommodating to us"; a citizen contemplating being annexed by Jackson  "we would be trading that wonderful life for something unknown".
The chancellor was not manifestly in error in finding this indicium of reasonableness supported Ridgeland. Other benefits which would accrue to the annexed residents included water, sewage and transportation services; police, fire and ambulance services; recreation services and all at a low tax rate.

Impact on voting strength of minorities
The chancellor noted: "No change. It was 12 percent before and 12 percent if the annexation is granted." This is not one of the factors addressed as error by Jackson. However, the fact that in the entire original proposed annexation area there were only slightly more than 1,000 residents would explain the lack of change in minority voting strength. The testimony of Joseph Lusteck, based on the 1990 public census, supported this finding. No evidence to the contrary was offered.

Benefits without taxes
The chancellor stated:
The property owners in the area sought to be annexed do not object and already are using and enjoying the benefits of the proximity to Ridgeland. Ridgeland provides the community services, parks and recreation, shopping facilities, etc., for these residents, outside the city. Some services have been provided since 1951. For example  Ridgeland, since 1985, has responded to approximately 70 fire calls in the western area and 250 in the eastern area at an average pro rata cost of $1400 a trip, based on the testimony and the exhibit marking the fire locations. They already provide police protection, either primary or backup.
Ridgeland cites the same evidence which the chancellor alluded to, detailing the various services Ridgeland already provided to residents of the areas. Mayor McGee confirmed that in the eastern annexation area, around the reservoir, Ridgeland already provided both fire protection and ambulance and rescue service, first response, and police protection as a back-up response. Joseph Lusteck testified the annexed area would provide only a 7.3% increase to the present assessed tax valuation of Ridgeland, indicating Ridgeland was not merely making a "tax grab" as is commonly asserted in annexations. Michael Bridge testified that Ridgeland also maintained a soccer/recreation field in the eastern area and that, in general, residents would receive "high quality, high level" of services in exchange for a very light tax burden. In addition, he stated water, sewer and garbage rates for residents would actually decrease upon annexation. Jackson does not address this factor as containing an erroneous finding by the chancellor and no error is indicated.

Other factors
As Ridgeland correctly acknowledges, here lies the heart of Jackson's argument against this annexation. Coupled with its argument that this Court's City of Jackson decision involving these same cities changed the standard to be applied, Jackson argues that reasonableness must consider the adverse impact upon Jackson and any plans for Jackson's future expansion.
Jackson argues the negative impact of this annexation will be substantial to Jackson and that under the decision of City of Jackson, consideration of these unspecified "other factors" supports the conclusion that the chancellor was manifestly in error in approving most of the requested annexation. In City of Jackson v. City of Madison, Jackson unsuccessfully asserted the very same argument to challenge the City of Madison's efforts to annex just over 10 square miles. The lower court therein properly applied the same standard we consider today, disallowed parts of *562 Madison's proposed annexation areas and affirmed others he found were "reasonable" under the totality of the circumstances. This Court in affirming, stated in part:
This Court understands Jackson's desire to have its city limits coterminous with its economic, social, and transportation structure. However, on these particular facts, to find that the "Jackson factor" prevents annexation of the proposed annexation by the City of Madison would be to declare this a super-factor or an independent dispositive test, which we decline to do.
Id.
Consistent with this Court's holding in the above-referenced case, this Court has reviewed the chancellor's determination of the traditional indicia of reasonableness. We find that the chancellor applied the correct legal standards, and that the chancellor's factual determinations were supported by the evidence of record. Testimony from such persons as Jackson Mayor Kane Ditto was to the effect that this annexation is unique because it involves and will impact Jackson. He suggested Jackson must be allowed to expand when it is ready: "And in looking nationwide, the only cities that I have seen that are able to, in a very effective way, maintain those services and facilities, have been cities that have either been able to annex aggressively in all directions along the major paths of growth... ." The mayor further stated inexplicably that it was reasonable for Jackson to expand south/south west, but not to the northwest. He stated Jackson had never experienced a lot of growth in that direction and probably would not in the future. However, the mayor did state Jackson would eventually like to expand to the areas Ridgeland currently seeks; he estimated at least looking at these areas sometime after the Byram annexation, in 3-5 years. He later admitted the Byram annexation was large, encompassing some 24 square miles, and later annexation efforts would depend on how and when the Byram case proceeded. The mayor conceded it was not possible for Jackson to access the western area without leaving Jackson and driving into Madison county. He further admitted Jackson is not growing, either in terms of population or in applications for building permits.
Mayor Ditto contended that "the Supreme Court recognized" in City of Jackson that "all areas adjacent to Jackson are within our paths of growth." He testified that in order to maintain its status as the "Capital City," Jackson needed to capture as much of the growth of the metropolitan area as possible, particularly in terms of tax dollars.
This factor does not indicate Ridgeland's proposal is unreasonable. The chancellor clearly addressed the effect on Jackson and considered Jackson's path of growth. City of Jackson did not appear to elevate this indicium to a "super-factor," since this Court has continued in the more recent annexation decisions to consider all of the reasonableness factors under the totality of the circumstances of each particular case. No manifest error is indicated.

V. WHETHER BASIC PRINCIPLES OF EQUITY, FAIRNESS AND PUBLIC POLICY, AS IDENTIFIED BY THIS COURT, REQUIRE REVERSAL OF THE LOWER COURT RULING.
The only reference to this issue appears in the conclusion of Jackson's brief where they urge: "Errors of law have been committed. The net result is that a serious mistake has been made. The mistake goes to the very heart of the equity and fairness doctrines which underlie all annexation cases."
Ridgeland counters that to give Jackson judicial preference over other smaller, surrounding cities would be most unfair. Ridgeland argues there is no authority for Jackson's argument that a "heightened standard" applies to this annexation matter because of its impact on Jackson, such that Ridgeland (or any other city wishing to annex this area) must establish a clear, overriding need to do so. Ridgeland concludes, "what Jackson really wants is the authority to prevent cities in the metropolitan area from expanding without Jackson's permission." This, Ridgeland urges, would be unfair.
This Court's conclusion in City of Madison v. City of Jackson, is most relevant:

*563 City of Jackson did not change the proof required in annexation cases where the proposed annexation area is within Jackson's path of growth. Instead, City of Jackson merely requires that any detriment to Jackson be given great weight under the "other factors" indicium, which is what the chancellor determined in the case sub judice. As the chancellor stated here, had the proposed annexation been immediately adjacent to the City of Jackson or had Jackson indicated an intent to annex this area itself, City of Jackson may have mandated a different result. But on the facts of this particular case, the annexation was "clearly mandated by law" as all indicia of reasonableness favored annexation.
A footnote to the above conclusion went to the idea that City of Jackson also might have mandated a different result if "Jackson's path of growth to the north been completely cut off" by Madison's proposed annexation. Id., footnote 11.
This Court finds that the same conclusion results upon review of the chancellor's findings on the indicia of reasonableness and his resulting conclusion in the case sub judice. The indicia of reasonableness overwhelmingly support the chancellor's judgment that annexation of the proposed areas was reasonable and fair.
Joseph Lusteck, urban planner, summed up the variety of factors indicating the annexation areas are in Ridgeland's path of growth:
It is immediately adjacent to the city, it is directly accessible by in-use streets. It clearly contains some spill-over of urban development of the same character as that within the city. It is clearly in need of municipal services, it is clearly in need of municipal type facilities, ... evidenced by the fact that they are already being provided, in some cases... . There is a community of interest between the eastern area and ... the City. For example, the addresses are Ridgeland addresses; the telephone exchange is the Ridgeland telephone exchange; the kids who live in that mobile home park, for the most part, go to school at Ridgeland Elementary School. .. . [M]ost of the traffic that comes from the northwest, west, or southwest, that is, from any points ... accessible by Interstate 55  that intend to go to the Barnett Reservoir, using the Main Harbour area as its point of access, would have to drive through the City of Ridgeland. Likewise, you know, the consequence of that not only wears the street but, obviously, those police officers that are out there trying to move the traffic... . The calls that the Fire Department makes and the Police Department makes on a courtesy good-neighbor basis to that area, again, is evidence that it's Ridgeland that is the neighbor that's called on to provide the services... . so there is certainly a path of growth, and there is a need. Ridgeland needs to include the area out of fairness, if nothing else.

The chancellor disallowed certain areas of Ridgeland's proposal as clearly not needed and thus, unreasonable. He expressly found Jackson had a need to grow to the north and northwest, and that Jackson demonstrated no intent to annex the proposed areas in the foreseeable future. The chancellor kept this Court's decision in City of Jackson at the center of his analysis and appeared to demonstrate a concern for fairness to both Jackson, Ridgeland, and the affected residents of the areas to be annexed. No manifest error appears in the decision of the lower court approving Ridgeland's annexation of part of the areas sought.

CONCLUSION
The very crux of Jackson's argument against Ridgeland's annexation utilized this Court's 1989 City of Jackson decision and claimed that reasonableness must consider the adverse impact upon Jackson and its future plans for expansion. The chancellor did just that in this case.
Jackson has not been cut off from further growth. The city can still grow to the north, northwest, south, and southwest. The record clearly reflects that after the current annexation by Ridgeland, Jackson would be left with 75.2 square miles adjacent to it within which the city could grow.
*564 Jackson claimed that Ridgeland's growth, if any, was the result of spillover from the capital city. Although the mere fact that the two cities share a common boundary would indicate some spillover, that is not indicative of the total growth of Ridgeland. Ridgeland has existed for many years, has shown steady growth all along, but experienced a rapid population increase of 344% since 1970. Ridgeland's lengthy existence removes it from the familiar claim of being merely a recently incorporated, spillover bedroom community of Jackson. Citing the Northpark Mall, Jackson argued that Ridgeland has benefited from its close proximity to Jackson in attracting new residents and business interests. However, it is noteworthy, as Ridgeland countered, that Jackson was either unable or unwilling to accommodate the Northpark developers; the original proposed site of that commercial establishment in Jackson was still vacant at the time of this proceeding. It appears Ridgeland is simply doing something right.
The chancellor did not allow Ridgeland to annex all of the area that the city had sought to incorporate within its boundaries. The chancellor disallowed certain prime commercial areas on the west side of Ridgeland's present city limits near the intersection of Livingston Road and Old Agency Road. In doing so, the chancellor stated, "the court believes this is unreasonable, as it will eliminate one of Jackson's north/south arteries, which is not needed by the City of Ridgeland at all." The chancellor also disallowed property on the east side of Ridgeland as not needed, and thus, unreasonable. He expressly found Jackson has a need to grow to the north and northwest and that Jackson demonstrated no intent to annex the proposed areas in the foreseeable future.
More importantly, the chancellor certainly kept this Court's decision in City of Jackson at the very center of his analysis and ultimate decision. Chancellor Warner indicated that he had read and re-read the City of Jackson opinion in connection with the facts of this case. The chancellor continuously demonstrated a concern for fairness to Jackson, Ridgeland and the affected residents within the areas considered for annexation. This is exactly what the statute and our case law dictates; fairness to all parties and the citizens affected within the proposed annexed areas.
Regarding the views of the citizens in the affected areas, we note that not a single citizen in the approved areas objected to Ridgeland's annexation efforts. Many of these citizens literally begged Ridgeland to annex them into its city limits. Common sense occasionally prevails as illustrated by a representative comment from a citizen in the affected areas, "it just makes sense that we should be in Ridgeland." Yes, it does and henceforth, you are.
This Court's most difficult annexation cases arise when the area in dispute involves two adjacent cities, and one of them, and occasionally both, attempt to annex the same area, which is potentially within the path of growth of both cities.
It becomes increasingly more difficult when Jackson and the surrounding metropolitan cities are involved in these annexation attempts. Who should prevail to the alleged detriment of the other? Jackson and Ridgeland have common boundaries. The particular areas allowed for annexation by the chancellor are immediately adjacent to Ridgeland. Ridgeland's path of growth is clearly to the west. Indeed, that is Ridgeland's only remaining path since it is cut off to the north by Madison, to the east by the Barnett Reservoir, and to the south by Jackson. Ridgeland does not have paths of growth. There is only one path for Ridgeland and that path leads westward. If that path were curtailed, Ridgeland would cease to grow and expand.
Ridgeland has already been providing services to the annexation area and the area is directly accessible by in-use streets. Ridgeland's spill over growth to the areas was clearly established by the evidence. The children of the areas attend Ridgeland Elementary School and Madison Central High School.
Jackson was the only objector. In essence, Jackson is saying to Ridgeland as noted by the chancellor, "You are big enough, little brother; you can't grow anymore." Ridgeland maintained that what *565 Jackson really wants is authority to prevent all other metropolitan area cities from expanding unless they have Jackson's permission. We decline to give Jackson such veto authority. City of Jackson only required that Jackson be given great weight when consideration of all the other indicia of reasonableness is undertaken. It is obvious that the chancellor did just that in this case. When we examine the chancellor's findings and opinion, he followed the correct legal standard and the annexation was fair and reasonable under all indicia, including allowing for the "great weight" afforded Jackson.
This case should not be about big versus little. Neither should it be about Jackson having a priority over its smaller neighboring cities who desire to annex additional territory due to growth. In a case between two cities, we experience great difficulty determining which should have a greater right to property proposed for annexation. That is the job of the chancellor under our present legal configuration as determined by the legislature. Unless we can say that the chancellor was manifestly wrong, failed to use the proper standard, failed to adequately examine and apply the indicia of reasonableness or rendered a decision that was not fair and equitable to both cities as well as the resident citizens of the affected areas, we cannot reverse the case.
In the case sub judice, the chancellor found reasonable that portion of property allowed to be annexed by Ridgeland. The correct legal standard was applied, no erroneous legal conclusions were reached, the proper indicia of reasonableness, including a "heightened weight" given to Jackson under City of Jackson was considered and the area to be annexed by Ridgeland was determined to be reasonable by the chancellor. There was no error, nor can we say that the chancellor was manifestly wrong.
JUDGMENT IS AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and JAMES L. ROBERTS, Jr., JJ., concur.
DAN M. LEE, P.J., concurs in result only.
BANKS and McRAE, JJ., dissent with separate written opinion.
BANKS, Justice, dissenting:
The problem with this case is that the Learned Chancellor viewed the concern expressed by this court in In the Matter of the Boundaries of City of Jackson, 551 So.2d 861 (Miss. 1989), as one of law rather than one of fact. He expressed shock at the suggestion that this Court would read into the law a preference for large cities over small ones. While it is clear that this Court cannot read into a statute that which is not there, this Court can take cognizance of facts which are material to any consideration of annexation in a particular area.
One such fact is that patterns of growth and indeed growth itself, in a metropolitan area consisting of but one large central city and a number of adjacent "bedroom" communities cannot rationally be attributed to an adjacent municipality without consideration of the central city's, services, amenities, jobs, capital investment and the like which attract that growth. Another such fact is that annexations in the area, once approved may have the effect of permanently depriving the central city of a life sustaining intake valve. In other words, annexation in such an area may not be rationally assessed as to reasonableness on the basis of "what's good for the goose is good for the gander" or the "hummingbird" to use the words of the chancellor. Simply put, in such simplistic terms, a five pound goose requires more food, water and room to roam, among other things, than a five ounce hummingbird. Where the hummingbird is not a hummingbird at all but rather a creature which depends upon the good health of the goose for its ultimate survival, it is even more clear that so called "equal" treatment is less equal than misguided.
The proof in the instant case is overwhelming that Ridgeland's growth is attributed to its proximity to Jackson, that much of it is spill-over from Jackson, and that the self-described "essentially suburban community" depends upon Jackson.
*566 I dissent for the same reason expressed briefly in my dissent in City of Jackson v. City of Madison, 650 So.2d 490 (Miss. 1995). I do not believe that the City of Ridgeland has demonstrated a need for this annexation. In order for further expansion of the boundaries of a bedroom community in this metropolitan area to be reasonable, a compelling need should be established. In The Matter of the Boundaries of City of Jackson, 551 So.2d at 868. Because there is no such need here, this annexation should fail. In the very least this matter should be remanded for consideration by the chancellor with a correct view of this court's holding in In the Matter of the Boundaries of the City of Jackson.
McRAE, Justice, dissenting:
I further dissent for the same reasons set forth in my dissent in the recently decided annexation case of City of Jackson v. City of Madison, 650 So.2d 490. The state constitution places the management of our cities and towns within the ambit of the state legislature by stating:
The legislature shall pass general laws, under which local and private interest shall be provided for and protected, and under which cities and towns may be chartered and their charters amended, and under which corporations may be created, organized, and their acts of incorporation altered; and all such laws shall be subject to repeal or amendment.
Miss. Const. art. 4, § 88.
Annexation should be a creature of legislation, particularly when two cities both want to expand in the same direction. The legislature created the cities, and therefore, should determine the mechanisms by which boundaries are to expand. True, the legislature has enacted statutes regarding the expansion of boundaries between cities, however, it is rudimentary that the power to enact such laws is derived from our state constitution itself. See Miss. Code Ann. § 21-1-27 to 21-1-47; Miss. Const. art. 4, § 88. The Court's criteria does not adequately address the situation where there are conflicting interests from both cities wanting the same area. Furthermore, even under our statutes, which provide the means of determining when one city desires to annex an area, any changes, such as additional criteria to be reviewed, should be made by statute. Under our current criteria, the city of Jackson can object, but it cannot win under any circumstances. When this Court decides an annexation case, it, in essence, legislates.
In reality, annexation cases will be decided according to what one person, the chancellor, desires. The legislature, not the lone chancellor, provides a more appropriate voice for the people who are to be incorporated or to allow the issue to be decided by the legislature when two governmental entities are involved. I will continue to recite this Court's statement in Matter of Extension of the Boundaries of the City of Jackson, 551 So.2d 861 (Miss. 1989) whereupon we said, "[a]nnexation is a legislative affair, the judicial function is a matter of whether the annexation was reasonable." Id. at 863. Our legislature acts out of concern of what is best for the overall community whereas our courts are to apply legal standards and evidentiary rules to decide for particular parties. See Matter of the Enlargement of the Corporate Limits of the City of Hattiesburg, 588 So.2d 814, 836 (Miss. 1991).
Once again, I urge the legislative branch to take annexations under its belt in order to give affected people a representative voice. Accordingly, I dissent.