PIERCE, Justice,
for the Court:
¶ 1. The Lee County Chancery Court entered a decree approving and ratifying, with modifications, an annexation ordinance adopted by the City of Tupelo, Mississippi. Notices of appeal were filed by Lee County, Mississippi; the Belden Fire Protection District, the Palmetto-Old Union Fire Protection District, the Unity Fire Protection District (collectively the Fire Protection Districts); and the City of Sal-tillo, Mississippi. We affirm the chancery court’s decree.
FACTS AND PROCEDURAL HISTORY
¶ 2. Tupelo adopted an annexation ordinance on July 3, 2007, which sought to extend and enlarge Tupelo’s boundaries to include seven proposed areas, totaling approximately 16.2 square miles, identified as Area 1, Area 2 North, Area 2 South, Area *261 3, Area 4, Area 5, and Area 6 (“PAAs” or “annexed territory”), each of which lies adjacent to Tupelo’s current municipal limits.[1] Tupelo filed a petition in the chancery court on September 12, 2008, seeking approval and ratification of its July 2007 annexation ordinance. Lee County, the Fire Protection Districts, and Saltillo, along with the Town of Plantersville, Mississippi, each filed answers and objections to Tupelo’s annexation petition. Trial began in the matter in March 2010 and concluded in June 2010, after which the chancery court approved Tupelo’s PAAs in their entirety, with the exception of a portion located in Area 5, which the court excluded from the final annexation decree.
¶ 3. Lee County, the Fire Protections District, and Saltillo appeal to this Court. The three entities are represented by separate counsel and have filed separate briefs. They assert a total of twelve issues between them, some of which are either the same or cumulative. In the interests of clarity and brevity, we have narrowed the total down to six, as follows:
I. Whether the chancery court had jurisdiction over Tupelo’s annexation petition.
II. Whether Tupelo’s request for voluntary dismissal of the prior annexation petition bars the use of the annexation ordinance in a second subsequent action for annexation without reuthorization of the annexation ordinance by Tupelo’s newly constituted city council.
III. Whether the chancery court committed reversible error in not allowing a Daubert examination of Tupelo’s expert witness, Karen Fernandez.
IV. Whether the chancery court’s decision finding Tupelo’s annexation reasonable, as modified, was manifestly wrong and/or not supported by substantial and credible evidence.
V. Whether the chancery court erred in failing to consider the inequitable and unreasonable impact of Tupelo’s annexation upon the Lee County Fire Protection Districts and the residents and property owners annexed.
VI. Whether the chancery court erred in taxing the cost of Tupe-lo’s publication of the statutorily-mandated notice to the public against Lee County.
¶ 4. Additional facts, as necessary, will be related during our discussion of the issues.
DISCUSSION
I. Jurisdiction
¶ 5. Both Lee County and Saltillo argue that the proceedings in the chancery court were procedurally flawed and that they deprived residents and property owners in the PAAs of their fundamental and statutory due process rights. Both concede that Tupelo met the notice requirements prescribed by Mississippi Code Sections 21-1-15 and 21-1-31 (Rev.2007) after Tupelo filed its annexation petition on September 12, 2008. But they contend the chancery court lost jurisdiction over Tupe-lo’s annexation petition at the conclusion of a hearing held on November 3, 2008, when the matter was recessed without being set *262 for a date and time certain for future proceedings.
¶ 6. Section 21-1-31 sets forth the notice requirements in annexation matters and provides, in part, as follows:
Upon the filing of such petition and upon application therefor by the petitioner, the chancellor shall fix a date certain, either in term time or in vacation, when a hearing on said petition will be held, and notice thereof shall be given in the same manner and for the same length of time as is provided in [Mississippi Code Annotated] section 21-1-15 with regard to the creation of municipal corporations, and all parties interested in, affected by, or being aggrieved by said proposed enlargement or contraction shall have the right to appear at such hearing and present their objection to such proposed enlargement or contraction.
Section 21-1-15, which is incorporated by reference in Section 21-1-31, requires notice to be given both by publication in “some newspaper published or having general circulation in the territory proposed to be [annexed]” as well as by posting “a copy of such notice in three or more public places in such territory[;][t]he first publication of such notice and the posted notice shall be made at least thirty days prior to the day fixed for the hearing of said petition....”
¶ 7. The notice required by Section 21-1-15 is in lieu of personal service and must be strictly complied with. Myrick v. Stringer, 336 So.2d 209, 210 (1976). “[F]ailure to give proper notice in annexation cases renders a chancery court without jurisdiction to hear the case....” In re Enlargement and Extension of Mun. Boundaries of the City of Clinton, 920 So.2d 452, 456 (Miss.2006). “The record must contain proof that posting and publication were accomplished in compliance with Section 21-1-15.” Fletcher v. Diamondhead Incorporators, 77 So.3d 92, 98 (Miss.2011). The petitioner bears the burden of proving that it met all the statutory notice requirements. Myrick, 336 So.2d at 210.
¶ 8. The annexation statutes do not provide for renotice of a continued hearing. Cf Fletcher, 77 So.3d at 98 (recognizing same for incorporation statutes). Once the statutory notice had been given in this case, all property owners within the areas proposed to be annexed became parties to the annexation proceedings in the chancery court. Sperry-Rand Corp. v. City of Jackson, 245 So.2d 574, 575 (Miss.1971). “This status continue^] through the final decree,” and remains “until and unless reversed or modified on appeal.” Id. “Once proper notice of the hearing date set by the chancellor has been provided in compliance with Section 21-1-15, if the hearing is continued, then all parties have notice.” Fletcher, 77 So.3d at 98.
¶ 9. The record before us affirmatively shows that Tupelo met the statutory notice requirements. That no order was immediately entered continuing the case to a specific future date and time was of no matter in this instance in light of the following facts.
¶ 10. After Tupelo filed its annexation petition on September 12, Tupelo obtained an order from the chancery court setting November 3 for public hearing on the petition. On October 1, 2008, notices of the public hearing were posted in three separate locations in each of the PAAs, and publication giving notice began on October 2, 2008. A petition in opposition to annexation was filed by 140 individuals on October 6, 2008. At the November 3 hearing, fifteen individual respondents appeared pro se in opposition to annexation, all from PAA “2 North.” The chancery court ob *263 tained from all fifteen pro se objectors their names, addresses, and phone numbers for the court’s file. The chancery ■court also questioned each objector as to whether he or she had any interest in' testifying and in receiving any future pleadings and discovery filings in the matter. The remainder of the November 3 hearing was devoted to discussions between the court and the respective attorneys regarding discovery schedules; eventually, the hearing was recessed with no new hearing date scheduled. On November 12, 2008, a scheduling order was entered setting discovery and dispositive-motion deadlines. And an order dated December 6, 2008, was entered providing as follows:
It is the Order of this [cjourt that all who have appeared in this proceeding, whether represented by legal counsel or not, shall provide and be provided with copies of all orders, notices, pleadings, discovery requests and discovery responses. This Order applies in place and stead of the directives obtained by the Court from individual objectors who appeared at the hearing held on November 3, 2008 concerning the desired level of participation of each.
Any pleadings filed or discovery requests propounded by any party after November 3, 2008 and prior to the date of entry of this Order shall be mailed to each individual objector that has appeared in this lawsuit to date. Objectors who appear the date of entry of this Order shall be entitled only to copies of orders, notices, pleadings, discovery requests and discovery responses filed and propounded from and after objector’s respective date of appearance.
The record indicates that all pro se objectors who had appeared in the case either through the October 6 petition, or the November 3 hearing, or afterward, were served with copies of all pleadings and discovery filings and provided copies of all orders and notices. This included a copy of the order setting trial for March 29, 2010.
¶ 11. The record also illustrates that an amended scheduling order was entered on February 11, 2009; a second amended scheduling order was entered on May 4, 2009; and a third amended scheduling order was entered on August 4, 2009 — which set a dispositive motion deadline of October 12, 2009. It was not until October 12, 2009, that Lee County and Saltillo each filed motions to dismiss, raising for the first time arguments that the chancery court had acquired, but lost, both subject matter and personal jurisdiction because no order of continuance to a date and time certain had been entered at the November 3 hearing. Lee County and Saltillo both argued to the chancery court that the court’s failure to designate “a date and time certain” violated the prescribed statutory requirements and those set forth in Rule 81 of the Mississippi Rules of Civil Procedure. Though inconsequential to our holding -with this issue, we mention that the record not only bears out that both Lee County and Saltillo waited until the last day of the dispositive-motion deadline to file their respective motions raising this claim, but they did so after they had participated in extensive discovery. Nevertheless, after the chancery court denied the motions, Saltillo sought, but was denied permission from this Court to file an interlocutory appeal on this and other issues. See Order Denying Interlocutory Appeal, City of Saltillo v. City of Tupelo, 2010-M-00118-SCT (Feb. 17, 2010).
¶ 12. On appeal, both Lee County and Saltillo concentrate their jurisdictional claim on the proposition that changes to boundaries of municipalities are strictly governed by Rule 81. Citing Vincent v. *264 Griffin, 872 So.2d 676 (Miss.2004), a child-support action, and Caples v. Caples, 686 So.2d 1071 (Miss.1996), a child-custody-modification action, Lee County contends: when a matter is continued for a hearing on a later date, an order must be entered on the hearing date which continues the matter to a specific future date and time when further proceedings will be held, otherwise the court loses jurisdiction because necessary and indispensable parties are not advised of the future hearing date.
¶ 18. As we explained in City of Jackson v. Byram Inc., 16 So.3d 662, 672 (Miss.2009), Rule 81 “provides that the Rules of Civil Procedure apply to all civil proceedings but are subject to limited , applicability in the following actions which are generally governed by statutory procedures ... (11) creation of and change in boundaries of municipalities.” (Emphasis added.) In both Vincent and Capíes, this Court spoke to the procedures prescribed by Rule 81(d), which states as follows:
(d) Procedure in Certain Actions and Matters. The special rules of procedure set forth in this paragraph shall apply to the actions and matters enumerated in subparagraphs (1) and (2) hereof and shall control to the extent they may be in conflict with any other provision of these rules.
(1) The following actions and matters shall be triable 80 days after completion of service of process in any manner other than by publication or 30 days after the first publication where process is by publication, to-wit: adoption; correction of birth certificate; alteration of name; termination of parental rights; paternity; legitimation; uniform reciprocal enforcement of support; determination of heirship; partition; probate of will in solemn form; caveat against probate of will; will contest; will construction; child custody actions; child support actions; and establishment of grandparents’ visitation.
(2) The following actions and matters shall be triable 7 days after completion of service of process in any manner other than by publication or 30 days after the first publication where process is by publication, to wit: removal of disabilities of minority; temporary relief in divorce, separate maintenance, child custody, or child support matters; modification or enforcement of custody, support, and alimony judgments; contempt; and estate matters and wards’ business in which notice is required but the time for notice is not prescribed by statute or by subparagraph (1) above.
(5) Upon the filing of any action or matter listed in subparagraphs (1) and (2) above, summons shall issue commanding the defendant or respondent to appear and defend at a time and place, either in term time or vacation, at which the same shall be heard. Said time and place shall be set by special order, general order or rule of the court. If such action or matter is not heard on the day set for hearing, it may by order signed on that day be continued to a later day for hearing without additional summons on the defendant or respondent. The court may by order or rule authorize its clerk to set such actions or matters for original hearing and to continue the same for hearing on a later date.
M.R.C.P. 81(d)(1), (2), and (5).
¶ 14. Vincent and Capíes concerned matters expressly listed in Rule 81(d)(1). We reversed and remanded both cases for a new hearing (Vincent) or a new trial (iCapíes) because one of the parties in each case did not receive notice consistent with Rule 81(d)(5). Rule 81(d)(5), however, does not apply in this case. *265 ¶ 15. Here, we find that the chancery court obtained personal jurisdiction over the parties once statutory notice was complied with, and indisputably had subject matter jurisdiction to adjudicate the merits of Tupelo’s annexation petition. Miss. Code Ann. §§ 21-1-29 and 21-1-33 (Rev. 2007). Based on the procedural facts of the case, jurisdiction remained with the chancery court throughout the proceedings until the notices of appeal were filed. This issue is without merit.
II. Reauthorization Assertion
¶ 16. Saltillo contends that Tupelo was barred from use of the July 2007 annexation ordinance because a voluntary dismissal was entered in the case prior to the time Tupelo filed its annexation petition on September 12, 2008. Saltillo submits that Tupelo’s voluntary dismissal constituted an effective repeal of the 2007 ordinance, which Tupelo should have voted to “reauthorize” at some point prior to the closing of the annexation trial in June 2010. Saltillo reasons that, if an ordinance for annexation is enacted upon the approval by the chancery court, it follows that the same ordinance for annexation can be repealed upon the dismissal of an annexation petition by the chancery court.
¶ 17. Though not directly on point, we find that the case of In the Matter of the Extension of Boundaries of City of Sardis, 954 So.2d 434 (Miss.2007), cited by Tupelo in its brief, effectively dispels Satillo’s notion. There, the City of Sardis adopted an annexation ordinance which later was confirmed by the chancery court. Id. at 435. Certain objectors appealed, and while on appeal, Sardis repealed the annexation ordinance. Id. at 436. As a result, the objectors and Sardis moved this Court to set aside the chancery court’s decree. Id. We responded with an order remanding the matter to the chancery court for consideration of the request to set aside. Id. On remand, Sardis presented the “repealer ordinance” to the chancery court, alongside its motion to set aside the decree. Id. The chancery court denied the motion for the following reasons:
(1) the City should not be allowed to change its position regarding the desirability of annexation subsequent to the entry of the Final Decree of the trial court; (2) the [cjourt should not set aside the decree unless error was shown on the part of the trial court; and (3) the proper course for the City should it no longer desire to include the subject territory would be to institute a deannexation proceeding.
Id. We subsequently. reversed and rendered the chancery court decree after finding that the chancery court had applied an erroneous legal standard in its denial of the motion to set aside the decree. Id. at 437-38. We reasoned as follows:
The City asserts that the decision to extend the boundaries of the municipality is a legislative decision. Therefore, if the City notifies the court that an annexation for which confirmation is pending has become undesirable, the judiciary is without authority to ratify such annexation. We agree.
It is well-established that annexation is a power belonging solely to the Legislature. Poole v. City of Pearl (In re Extension of the Boundaries), 908 So.2d 728, 730 (Miss.2005). “Municipal corporations are now, as they have always been in this state, purely creatures of legislative will ... their powers, their rights, their corporate existence, de-pende] entirely upon legislative discretion.” Id. (quoting Gully v. Williams Bros., Inc., 182 Miss. 119, 180 So. 400, 405-06 (Miss.1938)).
[[Image here]]
*266 The proposal, and likewise the withdrawal, of annexation is solely legislative. The City presented on remand an ordinance repealing its initial ordinance seeking annexation. Therefore, the chancery court erred in denying the City’s motion to set aside the decree granting annexation, as the court had no authority to force annexation in the face of a repeal ordinance from the municipality.
Id. at 437.
¶ 18. Here, Tupelo did not repeal the July 2007 annexation ordinance. Rather, Tupelo simply requested that the chancery court dismiss the matter without prejudice. The record (which the appellants were charged with designating pursuant to Rule 10(b) of the Mississippi Rules of Appellate Procedure) does not clearly disclose why Tupelo entered the request. It only indicates that the chancery court granted the request and did so without prejudice to Tupelo’s annexation petition. That being the case, we need only point out that “[wjithout prejudice” means “without loss of any rights; in a way that does not harm or cancel the legal rights or privileges of a party.” Black’s Law Dictionary 1632 (8th ed.2004). This issue is without merit.
III. Whether the chancery court committed reversible error in not allowing a Daubert examination of Tupelo’s expert witness, Karen Fernandez.
IV. Whether the chancery court’s decision finding Tupelo’s annexation reasonable, as modified, was manifestly wrong and/or not supported by substantial and credible evidence.
¶ 19. Issues two and three are inextricably interlinked and will be addressed together. Again, as mentioned, “[annexation is a legislative affair.” Extension of Boundaries of City of Ridgeland v. City of Ridgeland, 651 So.2d 548, 559 (Miss.1995). Confirmation of annexations, however, is placed within the province of the chancery court. Miss.Code Ann. § 21-1-33 (Rev.2007); Matter of the Boundaries of City of Jackson, 551 So.2d 861, 863 (Miss.1989). “The role of the judiciary in annexations is limited to one question: whether the annexation is reasonable.” Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson, 691 So.2d 978, 980 (Miss.1997). This Court will not reverse the chancery court’s findings as to the reasonableness of an annexation unless the chancellor’s decision is manifestly wrong and/or is not supported by substantial and credible evidence. In re Extension of Boundaries of City of Hattiesburg, 840 So.2d 69, 81 (Miss.2003). “To determine the reasonableness of the annexation, this Court has laid out twelve indicia of reasonableness which are not separate, independent tests, but rather need to be considered under the totality of circumstances.” In re Enlargement and Extension of Boundaries of City of Southaven, 5 So.3d 375, 376-77 (Miss.2009). They are as follows:
(1) the municipality’s need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality’s financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the area, (6) need for municipal services in the area sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city’s provision of services to its present residents, (9) economic or other *267 impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.
Id. at 377. We have further held that “municipalities must demonstrate through plans and otherwise, that residents of the annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness.” Matter of Extension of Boundaries of City of Columbus, 644 So.2d 1168, 1172 (Miss.1994).
¶ 20. Before we discuss the chancery court’s findings pertaining to each of the aforementioned indicia, we first address Saltillo’s and Lee County’s contention with regard to expert witness Karen Fernandez and Daubert.[2]
A. Daubert Challenge
¶21. Lee County and Saltillo argue that the chancery court admitted the testimony of Karen Fernandez, one of Tu-pelo’s numerous expert witnesses, without any evidence that her testimony met the requirements of Rule 702 of the Mississippi Rules of Evidence and the standards of Daubert. We find no error in the chancery court’s decision to allow Fernandez to testify as an expert witness in this case.
¶22. The admission of expert testimony lies within the sound discretion of the trial court. Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (Miss.2003). Rule 702 states:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
M.R.E. 702. In McLemore, this Court adopted the modified Daubert standard for determining the admissibility of expert testimony.
[T]he analytical framework provided by the modified Daubert [v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] standard requires the trial court to perform a two-pronged inquiry in determining whether expert testimony is admissible under 702. The modified Daubert rule is not limited to scientific expert testimony — rather, the rule applies equally to all types of expert testimony. First, the court must determine that the expert testimony is relevant — that is, the requirement that the testimony must “assist the trier of fact” means the evidence must be relevant. Next, the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the Daubert *268 analysis is a flexible one. Daubert provides “an illustrative, but not an exhaustive, list of factors” that trial courts may use in assessing the reliability of expert testimony.
McLemore, 863 So.2d at 38 (internal citations omitted).
¶ 23. Tupelo tendered Fernandez as an expert in the field of urban and regional planning. As mentioned, she was one of many experts offered by Tupelo at trial.[3] According to the record, Fernandez received a Master of Urban and Regional Planning degree in 1988 from the University of New Orleans, and she operates her own consulting firm located in New Orleans, Louisiana. Fernandez is a member of the American Planning Association, having co-hosted two national APA conferences, and the American Institute of Certified Planners, which requires biennial continuing education. Fernandez previously has testified as an expert in three Mississippi annexation matters: Byram Incorporators, 16 So.3d 662;[4] In re Enlargement and Extension of the Municipal Boundaries of the City of Jackson, 912 So.2d 961 (Miss.2005); and In re Enlargement and Extension of the Municipal Boundaries of the City of D’Iberville, 867 So.2d 241 (Miss.2004).
¶ 24. Fernandez testified she had undertaken extensive research in this matter by gathering facts and data pertaining to Tupelo and the PAAs. Much of Fernandez’s research was evident from maps, charts, graphs, and tables she prepared, all of which were admitted without objection as trial exhibits, showing conditions particular to Tupelo and the PAAs, including but not limited to maps reflecting census blocks and tracts, population change, and population density; maps reflecting current land use within Tupelo’s current city limits and the PAAs, including location of undeveloped parcels, analyzed in terms of location, square miles, and acreage; maps reflecting location of proposed installation of water and sewer lines in PAAs; graphs reflecting recent history of issuance of residential and commercial building permits in Tupelo, both by number issued and aggregate value; and a map reflecting development suitability of undeveloped parcels within current city limits in terms of severely constrained (lands floodway/flood-plain), moderately constrained, and unconstrained lands.
¶ 25. Fernandez repeatedly visited Tu-pelo to conduct field reconnaissance, met with city officials, and attended pretrial depositions. Fernandez gathered and analyzed a significant amount of existing information specific to Tupelo, which included Tupelo’s Development Code; Tupelo’s 2010 and 2025 Comprehensive Plans; Tu-pelo’s ordinances pertaining to health, safety, and welfare, existing water and sewer infrastructure, park and recreation opportunities Tupelo provides; Tupelo’s fire protection capabilities; city financial records; flood zones and floodways within Tupelo’s current city limits; septic tank suitability in PAAs; and maps of future land use.
¶ 26. After she was tendered as an expert in the field of urban and regional *269 planning, counsel for Saltillo sought to examine Fernandez under the modified Dau-bert standard. Referencing Daubert throughout his examination, counsel repeatedly asked Fernandez what “theory or technique” she employed on Tupelo’s need to expand, and whether that “theory or technique” had been “peer reviewed or tested” by others in the field of urban and regional planning. Clearly not familiar with Daubert (much less this particular aspect of it), Fernandez had difficulty responding to counsel’s question(s). Fernandez essentially reiterated after each question that she utilized a number of different data in order to analyze the growth and development within Tupelo. This inquiry went on for some time, until the chancellor interjected with the following:
To me, there are two issues. First of all, is urban and city planning a legitimate field of study, or is it some novel, commonly called junk science. Well, the [cjourts in Mississippi have repeatedly held that it is a legitimate field of study[, and] experts have testified in this field, so far as Daubert is concerned[.][T]he [c]ourt is going to adjudicate that it is a legitimate field of study that has been established by all of the Daubert tests over a long period of time.
Now, the other issue is whether [Fernandez] is qualified as an expert to testify in urban and city planning, or urban and regional planning. That’s the other part.
Now, as far as attacking the discipline, I think it’s well established it is a legitimate discipline.
[[Image here]]
The [c]ourt is of the opinion that [Fernandez] is qualified as an expert by virtue of her training, experience^] and prior testimony in court to testify in the area of urban and regional planning.
¶ 27. On appeal, as they did in the chancery court, Saltillo and Lee County insist that Fernandez’s expert testimony was admissible only under the “nonexclusive list of factors” set forth by the Dau-bert Court to be used in assessing reliability of such testimony. Those are: (1) whether the theory or technique can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (8) whether there is a high known or potential rate, of error respecting the technique; (4) whether there are standards that control the operation of the technique; and (5) whether the theory or technique has been generally accepted within the relevant scientific community.
¶ 28. In Poole v. Avara, 908 So.2d 716, 724 (Miss.2005), we explained:
[O]ur opinion in McLemore clearly states that ... the factors mentioned in Daubert do not constitute an exclusive fist of those to be considered in making the determination[; rather] Daubert’s, ‘list of factors was meant to be helpful, not definitive.’ 863 So.2d at 39 (quoting Kumho Tire [Co., Ltd. v. Carmichael, 526 U.S. 137, 151 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) ]. Looking to the Fifth Circuit for guidance, the [McLe-more ] Court re-emphasized that the Daubert list is illustrative, but is not exhaustive. [McLemore, 863 So.2d] at 38 (citing Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir.2002)). Mississippi is not unique in its interpretation of Daubert. The Daubert Court itself did not claim it was rigidly defining elements required for expert testimony to be admissible, but rather providing only “general observations” it deemed appropriate. 509 U.S. at 593, 113 S.Ct. 2786. Indeed the Court stated, “Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.” Id. A later look at Daubert by the U.S. Supreme *270 Court provided the same result, concluding that “[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert .... Too much depends upon the particular circumstance of the particular ease at issue.” Kwmho Tire, 526 U.S. at 150, 119 S.Ct. 1167. That Court went on to state that “It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review.” Id. at 151,119 S.Ct. 1167.
Id. at 723 (emphasis added).
¶ 29. As the chancery court correctly found, Mississippi courts routinely have allowed the use of experts such as Fernandez in annexation cases to assist the court on the twelve indicia and reasonableness of proposed annexation. This includes those periods when Mississippi was still adhering to the more rigid “general acceptance” test enumerated in Frye v. U.S., 293 Fed. 1013, 1014 (D.C.App.1923).
¶ 30. In City of Southaven, 5 So.3d at 377-84, Chris Watson,[5] testifying as an expert planner on behalf of Southaven, analyzed, among other things, year 2000 census data and building permit data in reaching an opinion on the twelve indicia.
¶ 31. In City of Madison (Enlargement and Extension of the Corporate Limits), 983 So.2d 1035, 1040-50 (Miss.2008), planning experts considered development already occurring in the proposed annexation areas, the city’s revenues and expenditures, ending fund balances over a period of years, and options for financing the cost of annexation in reaching opinions that the city had a need to expand and had the financial ability to annex.
¶ 32. In City of Clinton (Enlargement and Extension of Municipal Boundaries), 955 So.2d 307, 311-28 (Miss.2007), Chris Watson gave expert testimony on the twelve indicia of reasonableness based on his consideration of U.S. census data and what it reflected about population density; the city’s ordinances and their application to the PAAs upon annexation; the city’s past performance, evidenced by its efforts in accomplishing promises made in prior annexations; the benefits enjoyed by PAA residents as a result of proximity to the current city limits through shopping and working in the municipality, availability of municipal-level police and fire protection in the city, and park and recreation opportunities offered by the city; and the city’s need to expand evidenced by the amount of remaining developable land and history of issuance of building permits.
¶ 33. In Prestridge v. City of Petal, 841 So.2d 1048, 1057 (Miss.2003), planning experts testifying on the twelve indicia opined that the proposed annexation areas were within Petal’s path of growth as reflected by data on traffic flow and transportation corridors into the proposed annexation areas; that Petal was in need of expansion as evidenced by its extension of infrastructure in the proposed annexation areas and growth along the periphery of Petal’s existing city limits; that a need existed for overall zoning and planning to address instances of incompatible land uses, subdivision deficiencies, narrow-road and drainage issues; and that residents of the proposed annexation areas received benefits without payments of taxes through use of the city’s parks, medical, social, cultural, and religious facilities.
¶ 34. In City of Pearl, 908 So.2d at 733-43, planning experts considered development already occurring in the proposed annexation areas; the city’s tax revenue, Moody’s rating, funding options; and the *271 characteristics of land available for development in current city limits.
¶ 35. In City of Ridgeland, 651 So.2d at 554-61, expert testimony included lack of available land to meet increasing development and the need to expand Ridgeland’s borders so that it could exercise control over development and provide comprehensive planning for growth.
¶ 36. In Horn Lake, 630 So.2d 10, 17-26 (Miss.1993), a planning expert testified to the city’s need to expand, based on characteristics particular to the city, including topography and remaining developable land.
¶ 37. Here, Saltillo and Lee County offer no specific reason(s) whatever as to why Fernandez’s testimony should be considered unreliable. They simply maintain their general assertion that the chancery court must be reversed because the court failed to apply the “nonexclusive” Daubert factors.
¶ 38. Whether there are “tests, peer reviews, or publications” on the subject of annexation is beyond this Court’s purview. Saltillo and Lee County certainly did not challenge Fernandez with any such information at trial, and it is apparent from the record and the framing of their arguments on appeal they had no intention of doing so. The following excerpt, taken from a question Saltillo propounded to Fernandez during her voir dire, illustrates:
The way Daubert works, we take facts and data, ... and you apply it to a reliable method, that being the technique or theory, and you get a result, and that result, no matter who the expert is should be the same every time. If you use the same facts and data, and you apply it with a methodology that is proven, and it is proven reliable, then we’re going to get the same results no matter whether it’s you, or ... 10,000 other land planners.”
¶ 39. This is too narrow a take and application of Daubert. As Tupelo points out on appeal, no two municipalities or PAAs are the same. Each annexation involves fact-specific conditions and data, along with a multitude of variables that have to be taken into consideration. We find the following Fifth Circuit case cited by Tupelo to be analogous and insightful to the issue at hand. In St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 406-07 (5th Cir.2000), a suit involving damage to a marsh, the Fifth Circuit affirmed the district court’s acceptance of the plaintiffs expert, stating:
Each marsh will have different forces acting upon it, depending upon its specific location and surroundings. Thus, a court could not rationally expect a marshland expert would have published a peer-reviewed paper on each possible permutation of factors or each damaged area of marsh. Dr. [Robert] Chabreck’s testimony was based on his personal observation of the marsh in question and his general and undisputed expertise in marsh ecology and deterioration. The district court properly considered [these] alternative indices of his testimony’s reliability and relevance. See Kum-ho Tire, 119 S.Ct. at 1175-76.
¶ 40. We find no error in the chancery court’s decision to accept Fernandez’s expert testimony as both relevant and reliable. The court allowed her testimony to be subjected to intensive cross-examination, and it was then for the chancery court, sitting as trier of fact, to determine the weight and credibility of her testimony. This assignment of error is without merit.
B. Twelve Indicia of Reasonableness
1. Need to Expand
¶ 41. Lee County argues that the chancery court disregarded the weight of *272 the substantial and credible evidence submitted at trial which demonstrated that Tupelo does not have a present need to expand.
¶42. This Court has held that when making a determination as to whether a municipality has a reasonable need for expansion, the chancery court “may or may not” consider the following factors:
(1) spillover development into the proposed annexation area; (2) the City’s internal growth; (3) the City’s population growth; (4) the City’s need for development land; (5) the need for planning in the annexation area; (6) increased traffic counts; (7) the need to maintain and expand the City’s tax base; (8) limitations due to geography and surrounding cities; (9) remaining vacant land within the municipality; (10) environmental influences; (11) the city’s need to exercise control over the proposed annexation area; and (12) increased new building permit activity.
Enlarging, Extending and Defining Corp. Limits and Boundaries of the City of Horn Lake v. Town of Walls, 57 So.3d 1253,1259 (Miss.2011).
a.Spillover development into the PAAs
¶ 43. The chancery court determined that, with the exception of PAA 6, all of the PAAs have experienced spillover development, finding as follows:
The southern part of PAA 5 has some spillover development. Significant spillover has occurred in that portion of PAA 5 north of W. Main Street. The part of PAA 5 south of W. Main has experienced a lesser amount. PAA 4 has experienced spillover in the area known as “The Summit.” The northwest part of PAA 4 has experienced practically no spillover. PAA 2N and PAA 2S have experienced significant spillover growth, and PAA 3 has some older, mixed spillover growth.
b. Remaining vacant land within Tupelo
¶44. In addressing the remaining-vacant-land factor, the chancery court took into consideration: how the various paths of growth in the PAAs relate favorably or unfavorably to the proximity of the constrained and severely constrained vacant land; and how the paths of commercial and residential growth relate to their proximity to constrained and severely constrained land and accessibility to transportation. The court found that it was reasonable to assume that prime, vacant land constraints located in the southern portion of PAA 5 “[would] not attract commercial development such as is found in the areas nears Barnes Crossing Mall, nor will it serve as an area suitable for expanding commercial development in northeast Tu-pelo.” The court noted that there was between “22 and 32%” of vacant and deve-lopable land in Tupelo, “depending upon how agricultural land is considered.” As a result of the vacant land, which is constrained by flood plains and floodways and its proximity to commercial and residential development, Tupelo is in need of additional developable land. This, according to the chancery court, “is especially true since a cushion of developable land is needed.” Accordingly, the court found that substantial, credible evidence favors annexation of the PAAs with regard to land available for development.
c. City’s population growth
¶ 45. On this factor, the chancery court found that Tupelo has experienced a “51.57% increase in population since 1980, which is an annual increase of 1.84%.” And most of Tupelo’s residential development has occurred since the 1989 annexation.
*273 ¶ 46. Lee County argues that the evidence at trial demonstrated that Tupelo’s annual population growth has declined substantially since its previous 1989 annexation. Between 1990 and 2000, Tupelo experienced an annual growth in population of 1.04% per year; between 2000 and 2007, Tupelo’s population growth slowed to approximately 0.77% per year; and in 2008, its population growth was 0.48%. Tu-pelo responds, however, that significant population growth is expected to occur in Tupelo as a result of the opening of a Toyota Plant in nearby Blue Springs, Mississippi.
¶ 47. As this Court recognized in Town of Marion v. City of Meridian (In re Enlarging, Extending & Defining the Corporate Limits & Boundaries of the City of Meridian), 992 So.2d 1113, 1117-18 (Miss.2008), the fact that a city may have experienced a decrease in annual population growth, or even a “decline” in overall population, does not necessarily weigh against the city’s “need for expansion.”
d. Tupelo’s need for developable land
¶ 48. The chancery court found that, although Tupelo has land available for development, much of the land needed for various uses is not close enough to the paths of growth and is not reasonably expected to be utilized and developed. The court noted that a “prime of example of [this] problem is the lack of land available for commercial and retail development near the Barnes Crossing Mall.” The court found that the mall “acts as a magnet to customers in east and northeast Mississippi,” which is causing traffic to be a problem in the area, and which is being addressed by the proposed “northern loop.” Both PAA 1 and PAA 6 are in close proximity to this mall, and there has been commercial development south of the mall, “along [Highway] 45, and that development continues south to [Highway] 78.”
¶49. In addressing this factor, the chancery court referred back to the previous factor pertaining to the fact that Tupe-lo still has undeveloped, vacant land within its existing corporate limits. The court quoted the following portion from an annexation decision by this Court, in which we reiterated our refusal to set an absolute amount of usable vacant land that would prevent annexation:
Indeed[,] annexation in various cities such as “Southaven, Madison, and Ridgeland, which had usable vacant land of 43%, 59%, and 48%, respectively” were approved by this Court. [City of Hattiesburg, 840 So.2d at 85.] See also [City of Horn Lake, 630 So.2d at 18]; Enlargement and Extension of Mun. Boundaries of City of Madison v. City of Madison, 650 So.2d 490, 496 (Miss.1995); [City of Ridgeland,] 651 So.2d at 554-56. The dissent questions the chancellor’s findings because he did not hold that the City develop vacant land before annexing more land. However, as the above case law indicates, this Court refuses to set a limit on the vacant land available and has approved annexations when there has been as much as 59% usable vacant land available to an area. In addition, the evidence and testimony below revealed that the City met a number of the factors referenced in City of Macon, 854 So.2d at 1034, to meet the need to expand.
In re Extension of Boundaries of City of Winona, 879 So.2d 966, 974 -975 (Miss.2004). Accordingly, the chancery court found that there is substantial, credible evidence to favor annexation of the PAAs with regard to a need for developable land in proximity to Tupelo’s path of growth.
*274 e.Need for planning
¶ 50. According to the chancery court, all of the PAAs have needs for planning to some degree. “PAA 1 and PAA 6 have immediate needs for planning because of their close proximity to developing commercial areas in Tupelo.” And “Lee County offered no evidence of its intention to do any type of planning in these areas.” The chancery court further found that Tu-pelo has a history of proficiency at city planning, which demonstrates its ability and desire “to perform this task.” “Tupe-lo has shown a commitment to long-term planning as evidenced by the adoption of long-term plans and the continuing modification of those plans.” The court found that Tupelo also has allocated personnel and resources to this effort, which the documentary evidence supports. “The location of the PAAs in relationship to the current city limits when coupled with the fact that Lee County has little planning activity causes this to be an important factor indicating the reasonableness of the annexation.” Accordingly, the court found substantial, credible evidence to favor annexation of the PAAs with regard to planning.
f.Increased traffic
■ ¶51. The chancery court found that, because of Tupelo’s increase in vehicular traffic as a result of increased commercial activity and changing traffic patterns, especially in northeast Tupelo, the major thoroughfare committee has continued to develop and modify plans as the growth and change in transportation needs become evident. Thus, “solving the traffic issues in northeast Tupelo is supportive of annexation, especially in PAA 6.”
g.Need to expand tax base
¶ 52. The chancery court found this factor nonsignificant.
h.Limitations due to geography
¶ 53. The chancery court found this factor also nonsignificant.
i.Environmental influences
¶ 54. The chancery court found the problem of flood zones and floodways has caused some environmental problems, but ultimately concluded that this factor does not appear to be a major issue relative to the ability of Tupelo to provide services to the PAAs.
j. City’s need to exercise control over PAAs
¶ 55. The chancery court found that, “[a]s addressed in other parts of this opinion, [Tupelo] needs to have some degree of control and supervision over the PAAs so that the future development of these areas will occur in an orderly manner.”
k. Increased new building-permit activity
¶ 56. The chancery court found that “[h]istorically, Tupelo has been a thriving city with large commercial and residential development. As a result of the current economic downturn, the issuance of new building permits has abated somewhat. There is some evidence that renovations and additions to existing structures have increased.”
¶ 57. Given the substantial, credible evidence presented to the chancery court on this indicium, we cannot say that the court’s finding that this indicium weighed in favor of Tupelo’s proposed annexation was unreasonable.
2. Path of Growth
In determining the indicia of reasonableness for the path of growth, this Court has said that a “city need only show that the areas desired to be annexed are in ‘a’ path of growth [sic] this does not mean that the area is ‘the most urgent or even the city’s primary path of *275 ■growth.’ ” City of Winona, 879 So.2d at 977 (citations omitted). Moreover, this Court has set out a number of factors to be considered, such as: (1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development. Id. • ■
¶ 58. Most of the following is taken directly from the chancery court’s findings of fact with regard to the path-of-growth indicium.
PAA 1: The proximity of this PAA to Barnes Crossing Mall and other nearby commercial and retail business clearly shows that this area is in “a path of growth” of the City of Tupelo. Although there is little development along and either side of Highway 45 in this area, it is all the more reason to annex this area into the City to prevent undesirable growth patterns. The development of the “northern loop” will cause more traffic to funnel into this area and promote more growth. In the area north of Barnes Crossing Road on the east side of North Gloster, several multifamily apartment buildings have been constructed. There is little evidence of residential development in this area except for an area in the southwest part of the PAA.
PAA 1 is clearly a major path of growth for Tupelo, if not the major path of retail and commercial growth.
PAA 2 N: This area is in one of Tupelo’s paths of growth. In addition to being in close proximity to Barnes Crossing Mall with its large transportation and infrastructure development, it has in the past and continues to be an area with residential subdivision development.
Other factors which show a path of growth are:
—The interconnection of Barnes Crossing Road and the proposed “Northern Loop”;
—The adjacency of this PAA to Tupelo’s present city limits;
—The development of the Big Oaks Subdivision with its golf course and related facilities including garden homes, patio homes, and large lot residences; —The older, built-out Indian Hills subdivision;
—Tupelo water and pressurized sewer services.
According to the testimony of Perry Thomas, the developer of Big Oaks, the subdivision was developed in such a way to conform to applicable Tupelo codes and regulations so that the subdivision could be accepted upon annexation. Thomas testified that he anticipated further development of Big Oaks. Tupelo presently provides a fire hydrant in this area to enhance the present fire protection in the area. The Fire Protection District providing services to this area has no access to fire hydrants other than those of Tupelo, and their only other sources of water for fire suppression are tanker trucks and bodies of water.
¶ 59. PAA 2 N is one of Tupelo’s paths of growth.
PAA 2 S: This PAA is located on the east side of Tupelo and is adjacent to Highway 78, a major transportation route in north Mississippi. It has residential subdivision development, as well as some commercial development, including a recently constructed motel. The east 1/3 of this PAA is undeveloped. Several years ago there were plans to construct multi-family apartment build *276 ings along Stone Creek Boulevard. This proposal caused consternation from residents to the north of the proposed project. However, since Lee County does not have zoning regulations, the county was without authority to regulate and control the proposal.
Other factors that show a growth are: The area’s access to Highway 78 is through the limited access overpass located adjacent to the southwest part of this PAA. This intersection serves as a connecting link to downtown Tupelo by way of Veterans Boulevard and East Main Street. There is evidence of some commercial development in close proximity to the interchange.
¶ 60. PAA 2S is in one of Tupelo’s paths of growth.
PAA 3: This PAA is located east of PAA 2 and is likewise adjacent to Highway 78, and an overpass is located within the confines of this PAA. This intersection connects downtown Tupelo via Eason Boulevard and East Main Street. This PAA has scattered development of commercial enterprises with some residential development in the northeast quadrant of this area. There is some undeveloped land in this PAA. The existence of the overpass and interconnection of the area with downtown causes the court to be of the opinion that this is one of Tupelo’s paths of growth. The annexation of this area is consistent with thoroughfare development in Tupelo.
¶ 61. PAA 3 is one of Tupelo’s paths of growth.
PAA p This PAA 4 is located near the southeast corner of the present Tu-pelo city limits. The Summit subdivision is located in this PAA and is partially developed as a large lot subdivision with upscale homes. The area is served by Tupelo’s water and sewer departments. These systems were constructed in conformity with [Tupelo’s] standards and have been accepted by [Tupelo] and connected to [Tupelo’s] water and pressure sewer systems. The Summit has fire hydrants capable of supporting an enhanced level of fire protection. PAA 4 is located across Highway 45 from Verona, Mississippi, and is west of Plantersville. Both municipalities objected to the annexation of- this PAA. The subdivision development, including connections to Tupelo water and sewer, is indicative of a path of growth.
¶ 62. PAA 4 is located in one of Tupe-lo’s paths of growth.
PAA 5: PAA 5 extends along the entire west boundary of Tupelo and to some extent on Tupelo’s south and west side. The chancery court made the following observations with the aid of the exhibits presented at trial: The area south of W. Main Street is largely agricultural with a few, scattered small subdivisions that are lacking current development, although some have available lots for building. Much of this area is in the floodplain.
¶ 63. PAA 5 south of West Main Street is not in one of Tupelo’s paths of growth.
The area in PAA 5 north of W. Main Street is currently being developed with new subdivisions and multi-family housing. This area is adjacent to areas of Tupelo that continue to develop as residential areas. This area has both small and large lot subdivisions. It is served with Tupelo utility services. From a view of this area, it is evident that there has been in the very recent past, a substantial amount of residential building activity.
¶ 64. PAA 5 north of West Main Street is in one of Tupelo’s paths of growth.
PAA 6: This PAA is located on the north side of Tupelo. This area consists *277 of more than three square miles of largely agricultural land. The southern boundary of the PAA 6 is contiguous with the northern boundary of Highway 78. The east side of the PAA is located near the intersection of Highway 45 and Coley Road. Much of this area is located in the floodplain.
¶ 65. The factors found showing a path of growth in PAA 6 are as follows:
The present development of the “northern loop” will extend from the south boundary of PAA 6 on Highway 78 through the center of the PAA and connect with Barnes Crossing Road at its intersection with North Gloster Street. This has been a major, ongoing thoroughfare project of [Tupelo’s] even before annexation became a reality.
Because of the short distance of PAA 6 from Barnes Crossing Mall and surrounding commercial and retail development, the development of this area seems to be highly probable as a transportation corridor and area for development.
The most compelling factors for the annexation of PAA 6 are, the part this PAA plays in the major thoroughfare plan and the proximity to existing and developing retail and commercial development associated with thoroughfare development.
¶ 66. PAA 6 is in Tupelo’s path of growth.
¶ 67. Lee County argues the chancery court’s findings are contrary to Tupelo’s recently adopted Comprehensive Plan, “Tupelo 2025,” (2025 Comprehensive Plan) which sets forth the public policy for Tupe-lo’s physical growth for the period 2008 through 2025. Lee County contends that the adopted growth policy for Tupelo, as established by its 2025 Comprehensive Plan, is to increase density within the existing city. ¶ 68. Tupelo responds that Lee County ignores the method in which the twelve indicia are to be analyzed, and instead relies solely on its expert’s misinterpretation of Tupelo’s 2025 Comprehensive Plan. Tupelo maintains that the 2025 Comprehensive Plan contemplates both inward and outward growth and includes the PAAs.
¶ 69. We agree with Tupelo. We cannot say that Tupelo’s 2025 Comprehensive Plan is limited to an interpretation of being against annexation. And we can only presume that the chancery court concluded likewise. We find the chancery court’s findings for the path-of-growth indicium are supported by substantial and credible evidence and were not unreasonable.
3. Potential Health Hazards
¶70. The chancery court found the potential health hazards relevant for discussion in this case primarily concern sewer service. The court found that many areas in the PAAs do not have central sewer service, and it is uncontradicted that septic tanks do not work well in the PAAs because of soil conditions that do not allow adequate percolation of effluent from septic-tank field lines.
¶ 71. Tupelo serves some of the PAAs with its modern pressurized sewer system. The court noted that Tupelo, in particular, serves:
PAA 2 N Indian Hills and Big Oaks
PAA 4 The Summit
PAA 5 Green Tee, The Grove, West-wind, Autumn Hills, Summerlin and Grand Ole Oaks
PAA 2 S Deer Park
¶ 72. The court also found that the other health-hazard issue involves trash collection. Tupelo now has twice weekly trash collection. At present, the PAAs *278 now have only weekly trash collection furnished by Lee County.
¶ 73. The court concluded that the reliance on septic tanks in many parts of the PAAs to be annexed causes this indicium to favor annexation.
If 74. Lee County argues that the fact soil conditions are not suitable for septic-tank use is of no importance with regard to the undeveloped, agricultural lands which make up a substantial portion of the area sought to be annexed. Lee County also contends that Tupelo has failed to extend sanitary sewer service to between twenty-five and thirty-five homes on Green Tee Road in the existing city limits, and to the extent that the soil conditions in the PAAs are unsuitable for septic-tank use, the soil conditions along Green Tee Road are likewise not suitable. Lee County further contends that Tupelo has no plans to extend sewer service to Green Tee Road, despite it having been annexed more than twenty-one years ago, just as Tupelo has no plans for sanitary sewer service in any of PAA 6. Thus, to argue that soil conditions are not conducive to septic-tank usage is of no consequence, as there are no plans to eliminate such uses.
¶ 75. Tupelo responds that Lee County’s arguments are based on the unreasonable assumption that no further development will occur in the PAAs and that they ignore that significant portions of the PAAs are already developed, with many already receiving Tupelo utilities. It argues that Tupelo has shown plans and financial ability to extend infrastructure to service the PAAs that are not already being serviced. Tupelo maintains that it provides sewer to “more than 99% of its customers, and provides water to 100%.” Tupelo points to the record evidence which shows that only twenty-five to thirty-five of its 16,000 customers do not receive “Tu-pelo retail sewer” because these customers either chose to remain on septic tanks or live in an area where it was not economically feasible to provide “retail sewer.” Tupelo further maintains that it has shown its plan and financial capability to install gravity and pressure lines with attendant pumping stations and ancillary infrastructure in order to provide businesses and residences in the PAAs with municipal-level mechanical sewer services.
¶ 76. Based on our review of the record, we cannot say the chancery court failed to take attending facts on this indicium into consideration. Nor can we say the court’s ultimate finding on this indicium was contrary to the evidence presented.
4. Financial Ability
¶77. This Court has considered the following factors in determining whether there is reasonable financial ability for the annexation:
(1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City’s bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area.
City of Winona, 879 So.2d at 981-82 (citations omitted).
¶ 78. The financial ability of Tupelo to provide services promised in the annexation ordinance was demonstrated, primarily, by the testimony of Lynn Norris, Tu-pelo’s chief financial officer, and City Clerk Kim Hanna. The chancery court found from their testimony that Tupelo has a history of strong sales-tax revenues.[6] And *279 even though the recent sales-tax revenues had decreased due to the current economic downturn, the testimony of the financial experts showed that Tupelo’s financial condition remains strong. Many of the capital expenditures are made from current revenues, especially equipment purchases. Tu-pelo has “strong fund balances in the city departments.” Tupelo has other sources of revenue that have remained untapped, such as the funds that are available from the electric department. Tupelo has the ability to levy additional taxes; however, Tupelo takes the position that an increase in taxes will be unnecessary to finance the annexation costs. Norris testified that, by structuring the city’s long-term debt (utilizing “roll off’), Tupelo could obtain additional funds to service the debt that might be incurred to pay for the costs of the annexation. This could be done without an increase of the tax levy for bond-debt service.[7]
¶ 79. The court noted that much evidence was introduced relating to the “Service and Facilities Plan.” Tupelo developed this plan to show how it could provide services and facilities to the PAAs within a five-year time frame. The total amount of expenditures in the plan for both operating and capital expenditures is $24.5 million. The court found that the document was thoughtfully prepared with input from different city departments; the court stated as follows:
It is also important to understand that the Services and Facilities Plan is not a plan ‘carved in stone,’ but is a document that demonstrates Tupelo’s ability to provide services and facilities within the PAAs. As was noted by the city engineer, the plan is preliminary and is not based on complete data as would be the case for projects that are ready for construction. To expect such a detailed plan, would be both unreasonable and unfeasible. The plan, however, does show the city’s ability to provide services and facilities to the PAAs based on reasonable assumptions and projections. In addition, the plan will be subject to change when a final judicial determination is made as which areas are to be annexed. Further, the plan could also be modified to meet the demands of new development in the PAAs that are presently unforseen.
¶ 80. We find the chancery court’s finding that Tupelo has the financial ability to make improvements and provide municipal services is supported by substantial and credible evidence.
5. Need for Zoning and Overall Planning
¶ 81. For this indicium, the chancery court found that Tupelo has a full complement of municipal codes and ordinances, and Lee County has a limited number of such codes and ordinances. Tu-pelo also has a full staff of personnel to *280 enforce, monitor, and review codes and code enforcement.
¶ 82. The record supports the chancery-court’s findings.
6. Need for Municipal-Level Services
a.Police protection
¶ 83. Tupelo has a municipal-level police department, staffed with 115 officers. The department has several divisions, which include: patrol division, special operations, motorcycle traffic division, speed control division, detective division, narcotics division, traffic division, aviation division, S.W.A.T. team, bomb squad, canine officers, school resource officers, and code enforcement officers.
¶ 84. The chancery court found that Tupelo has a history of funding the needs of its department and has many police services that seem to be beyond what would be expected of a city its size. “On the other hand, Lee County is called upon to provide law enforcement services to a much larger area with lower population density. Economics constraints alone would preclude Lee County from providing municipal level law enforcement services to the PAAs that Tupelo now offers.”
b.Fire protection
¶ 85. At the time of trial, Tupelo had a Class 5 fire-protection rating.[8] It has multiple fire stations and a full complement of fire trucks and equipment. It has a fire training facility. In addition, it has a recently completed fire station near the Highway 78 and North Gloster Street interchange. Ninety-three full-time firefighters staff the department.
¶ 86. The PAAs currently are served by fire-protection districts. The chancery court found the fire-protection districts do not have the equipment, resources, personnel, and training necessary to provide the level of municipal fire protection needed by the PAAs. These districts do serve a need in the rural parts of some of the PAAs but cannot furnish a municipal level of fire protection. Aside from the legal issues regarding “right to serve,”[9] Tupelo’s ability to furnish fire protection greatly favors annexation of the approved PAAs.
¶ 87. The Tupelo Fire Department provides the following services: 1) fire suppression, 2) fire code inspection, 3) emergency medical response, 4) mutual aid to all other fire departments in Lee County when requested, 5) hazardous-material response, 6) fire prevention and education, 7) special rescue response, and 8) regular inspection/maintenance of fire hydrants,
c.Water and sewer services, garbage collection, and street lighting
Water service
¶88. The chancery court found that Tupelo obtains its potable water supply from the Northeast Regional Water Supply District from the Tennessee-Tom-bigbee Waterway. This water supply is sufficient for serving the present city limits as well as all of the PAAs. Tupelo continues to maintain its former water system, which uses wells and elevated water tanks. This is a backup system to the Regional Water Supply District for use in case of an emergency. Tupelo has a preliminary system design map that it covenants to implement after annexation is *281 completed. It will provide all PAAs with fire-protection water mains. The fire-protection water main system also will be constructed in those areas where existing commercial and residential water service is available. The estimated costs of this system of fire-protection water mains will be approximately $5 million.

Sewer system

¶ 89. The present sewer system in Tupelo generally uses a pressure system as opposed to the early gravity-flow technology. Coupled with this system is a new wastewater treatment facility with sufficient capacity to serve the proposed PAAs as well as the new Toyota plant, with room for additional capacity and certification well beyond its present capacity. Tupelo presently serves sewer customers in the following PAAs:
PAA 2 N Indian Hills Subdivision and Big Oaks Subdivision
PAA 2 S Deer Park Subdivision
PAA 4 Summit Subdivision
PAA 5 Part of Green Tee Subdivision
¶ 90. The costs of providing mechanical sewer treatment in those areas not presently served by Tupelo will be approximately $13.5 million over a period of five years.

Garbage collection

¶ 91. Tupelo will provide twice weekly garbage pickup as opposed to weekly garbage pickup in the PAAs that is provided by Lee County.

Street lighting

¶ 92. The chancery court found that Tupelo will provide street lighting to the PAAs that are annexed into the city according to the same policies that presently exist in Tupelo. “This serves as both a deterrent to crime and an enhancement to the quality of life in these areas.”
¶ 93. Accordingly, the chancery court found this indicium favors annexation. We find the chancery court’s finding that Tu-pelo has demonstrated a need for municipal services in the PAAs was supported by substantial and credible evidence.
7. Natural Barriers
¶ 94. The chancery court found no evidence of natural barriers that would preclude Tupelo from providing services to the PAAs as outlined in the annexation ordinance. Thus, this indicium favors annexation.
¶ 95. The record supports the chancery court’s finding on this indicium.
8. Past Performance
¶ 96. The chancery court found that Tupelo has substantially fulfilled its obligations to provide services to the areas previously annexed in 1989. The court also found that, beyond providing services to the 1989 annexed areas, Tupelo has provided water, sewer, and fire protection to some of the areas within the now proposed PAAs. Accordingly, “Tupelo has satisfactorily shown that its past performance in fulfilling its covenants in the 1989 annexation ordinance warrant confidence that it will do so when this annexation is finally approved.”
¶ 97. We find the chancery court’s findings for the past-performance indicium are supported by substantial and credible evidence.
9.Impact (Economic or Otherwise) of Annexation upon Those Who Live In or Own Property In Annexed Areas
¶ 98. The chancery court found that the PAAs will receive several immediate benefits as a result of inclusion in Tupelo’s city limits. Police protection will commence as soon as annexation is approved. As previously stated in this opinion, Tupelo has a well-equipped, trained, *282 and staffed municipal-level police department. The PAAs will receive the benefits of a Class 5 Fire Department for a period of two years, and that classification will be subject to review after the two-year period. A Class 5 classification will reduce insurance premiums in some instances in the PAAs. The chancery court noted that the Tupelo fire department and county fire departments have a history of working together, and that Tupelo currently responds to calls as needed in the PAAs. The court dismissed the fire protection districts’ argument that they alone should control fire protection services in the PAAs. The court found that such a position is not in the best interest of residents in the PAAs and would result in the deprivation to the residents of the superior fire protection Tupelo can provide. Accordingly, the court found that this indicium favors annexation, and its finding is supported by substantial, credible evidence.
10. Impact on Minority Voting Strength
¶ 99. The chancery court found that the evidence shows the dilution of minority voting strength as a result of annexation will be de minimis. Lee County argues, however, that the evidence and testimony presented at trial indicates that Tupelo failed accurately to project the impact its proposed annexation would have upon minority voting strength. Lee County further contends that the chancery court committed reversible error by limiting Lee County’s cross-examination of Tu-pelo’s expert, Fernandez, with regard to this issue.
¶ 100. The record supports the chancery court’s finding. Fernandez testified that the present city breakdown of voting age population is 73.8% white population, 24.9% African American population, and 1.3% other population.[10] After annexation, the combined city breakdown of voting age population will be 74.1% white population, 24.6% African-American population, and 1.4% other population.
¶ 101. This diminution in minority voting strength is less than that found in City of Meridian, 992 So.2d at 1123-24, where this Court upheld the following finding by the chancery court:
The population of Meridian was 44.0% white, 54.4% African American and 1.6% other in 2000. The voting age population of the City of Meridian is 50.2% white, 48.2% African American and 1.5% other according to the 2000 census. The area sought to be annexed is 84.4% white, 13.9% African American and 1.7% other. The resulting City of Meridian would, upon approval of the proposed annexation be 45.4% white, 53.0% African American and 1.6% other.... This diminution of the protected minority is not necessarily impermissible.
¶ 102. Similarly, we find the chancery court’s findings for this indicium were supported by substantial, credible evidence.
¶ 103. As for Lee County’s contention that the chancery court erred by limiting its cross-examination, we find no such error. During Lee County’s cross-examination of Fernandez on this indicium, Tupelo raised an objection to the line of questioning on the basis that Lee County had not disclosed any opinion of its expert. The chancery court reserved ruling on Tupelo’s objection, and allowed Lee County to make a proffer, subject to later ruling by the chancery court on Tupelo’s objection. During the proffer, Lee County questioned *283 Fernandez as to whether the 2000 census figures and 2007 estimates were the best information available with regard to her analysis of the proposed annexation’s effect on minority voting strength. The chancery court also asked its own questions during the course of Lee County’s proffer. Now ón appeal, Lee County suggests that the chancery court did not consider Fernandez’s proffered testimony. We fail to see how. First, a review of the record reveals that Lee County was not limited in the slightest during its proffer. And second, Fernandez maintained throughout the examination that she had conducted a proper analysis using the best information available and was of the opinion that the effect on minority voting strength was de minimis — as the chancery court found. This contention of error is without merit.
11. Residents in PAAs Not Paying Fair Share of Taxes
¶ 104. On this indicium, the chancery court simply noted some of the benefits that will accrue to residents in the PAAs as a result of annexation, including: “Access to parks and recreational facilities; access to numerous medical facilities and hospitals in Tupelo; access to Baneorp-South Coliseum; access to youth activities; access to retail shopping, especially the Barnes Crossing Mall.”
¶ 105. Citing City of Jackson, 912 So.2d 961, Lee County- contends the chancery court’s finding on this indicium reflects a misapplication of this Court’s prior interpretation of the “fair share” indicium and its impact on the reasonableness or unreasonableness of a municipal annexation. In City of Jackson, this Court held:
The City of Jackson offered generalized evidence to suggest that property owners in the PAA enjoy the benefits of Jackson without having to pay taxes for those benefits. Although one might argue that the proximity of the PAA to Jackson provides area residents with medical facilities, museums, parks, etc., this argument is without merit. No specific proof was forthcoming and the failure to develop the record to support this issue lies with Jackson. This Court will not go outside the record to assist Jackson where its proof is lacking.
Id. at 971 (citations omitted). Distinguishable from City of Jackson, the record evidence before us supports the chancery court’s finding that this indicium favors Tupelo’s proposed annexation.
¶ 106. In addition to the benefits summarized above by the chancery court, the record also illustrates that some residents in the PAAs, due to their proximity to Tupelo’s fire stations, already receive the benefits of lower fire premiums based on Tupelo’s Class 5-rated fire department, but pay no taxes to support the Tupelo Fire Department. And the only access the fire districts have to fire hydrants is through those belonging to Tupelo.
¶ 107. The evidence also revealed that Tupelo has a unique, progressive program in its “Major Thoroughfare Program,” which is funded solely by a 10-mill tax levy applied by the citizens of Tupelo on themselves through elections held every five years relative to various phases of the Major Thoroughfare Program. At the time of trial, Tupelo was in Phase IV, which includes, among other projects, expansion of a bridge over Town Creek, widening of South Gloster to five lanes, and construction of the northern loop in PAA 6 at a cost in excess of $14 million to connect Barnes Crossing Road/North Gloster Street with McCullough Boulevard and Coley Road. The 10-mill tax is levied only on property located in Tupelo’s municipal limits, and is used solely to fund the improvement or construction of major thoroughfares. The Major Thoroughfare Pro *284 gram operates on a cash basis only, using funds generated through 10-mil tax levy and funds received through grants and other sources, such as MDOT funds. Evidence showed that the impact of the Major Thoroughfare Program has been job growth, improved traffic flow, improved traffic safety, and enhanced economic development. Evidence also showed that residents in the PAAs enjoy and benefit from roads constructed or upgraded through Tupelo’s Major Thoroughfare Program, never having paid taxes in support thereof.
¶ 108. In City of Madison, 650 So.2d at 504, in which we upheld the chancery court’s finding that this particular indicium weighed in favor of annexation, the chancery court opined as follows:
Certainlyf,] these residents, particularly those who testified, use businesses located within the city. They shop at the grocery store and the drug store. They take their clothes to the laundry. They take their children to schools located within the city and to day care centers. They attend church in the city and other events and activities. Certainly they each benefit from a reduction in their insurance rate on their homes....
But in any event, certainly these citizens derive benefits from the close proximity to the City of Madison, and certainly they have done so without paying any taxes. And in the opinion of the court, if they’re going to bring their dirty laundry into town, they ought to at least help pay for the streets. The evidence suggests the reasonableness of the annexation.
¶ 109. Given the substantial, credible evidence presented to the chancery court, we cannot say the court’s finding that this indicium weighed in favor Tupelo’s proposed annexation was error.
12. Other Factors
¶ 110. The chancery court found none applicable in this case.
V. Whether the chancery court erred in failing to consider the inequitable and unreasonable impact of Tupelo annexation upon the Lee County fire-protection districts and the residents and property owners annexed.
¶ 111. Both Lee County and the fire-protection districts contend that the chancery court committed reversible error in approving Tupelo’s annexation without consideration of the inequitable and unreasonable impact the proposed annexation will have on the fire protection districts in the county,[11] as well as residents potentially subject to double taxation for fire-protection services.[12] They argue that Mississippi Code Section 19-5-151 (Supp.2011)[13] provides legal authority for the establish *285 ment of fire-protection districts and sets forth the express legal rights and obligations of the districts. They also argue that Mississippi Code Sections 19-5-165[14] and 19-5-175 (Rev.2003)[15] provide that fire-protection districts become public corporations in perpetuity and, as long as the fire-protection districts continue to furnish fire-protection services within their defined boundaries, the districts are the “sole public corporations empowered to furnish such services within such district.” Lee County and the fire-protection districts both contend that the evidence at trial indicates that Tupelo, if allowed to annex, will levy full municipal taxes against residents and property owners annexed, a portion of which supports Tupelo’s fire services. This, therefore, creates a conflict with Section 19-5-175. And as such, it was incumbent upon Tupelo to resolve this conflict before petitioning for annexation. Relying on Town of Walls, 57 So.Bd 1258, Lee County submits that Tupelo’s failure to do so has created an inequitable scenario which, Lee County states in its brief, can only play out in one of two ways:
(1) assuming that the Lee County Board of Supervisors continues to levy the 4 mill tax on behalf of the fire protection districts, the residents and property owners of the annexed area will be double taxed for the same service: fire protection; or (2) if the Board of Supervisors seeks to alleviate the double taxation problem created by Tupelo’s annexation by removing the 4 mill tax levy, the resulting loss of tax revenue to the Lee County fire protection districts will be absolutely devastating. Neither of these scenarios is equitable.
■¶ 112. Speaking to the arguments raised by Lee County and the fire protec *286 tion districts at trial, the chancery court found as follows:
Tupelo is completely surrounded by statutorily created [f]ire [protection [districts. All of these [f]ire [districts have classifications more than Class 5.[16] Tupelo is a Class 5 [district.[17]
[[Image here]]
The districts are equipped to suppress fire in a more rural setting. They rely on hauling water for fire suppression, have little access to fire hydrants with capacity for fire suppression, and are volunteer organizations.
The objectors cite [Section] 19-5-175.
To support the strict application of this code section, the objectors assert that Tupelo should make arrangements to purchase some of these systems or parts of systems or districts should be purchased? That question cannot be answered until annexation is final.
Notwithstanding the provisions of this section, this [c]ourt can find no authority to bar Tupelo from expanding its corporate limits into the PAAs which are all served by the [f]ire [protection [districts.
¶ 113. Neither can we, and we find no error in the chancery court’s rejection of Lee County’s and the fire-protection districts’ arguments.
¶ 114. Again, annexation is a legislative matter and the judiciary’s role in such matters is limited to assessing whether the annexation is reasonable. City of Jackson, 691 So.2d at 980 (Miss.1997); City of Ridgeland, 651 So.2d at 559.
¶ 115. True, in Town of Walls, we acknowledged a fire-protection district’s statutory right to exist as the “sole public corporation empowered to furnish” the services it was authorized to furnish, so long as the district actively continues to furnish such services. Town of Walls, 57 So.3d at 1266-67 (quoting Mississippi Code Section 19-5-175). And we accepted the chancery court’s additional findings in that case that, based on the results of Horn Lake’s 2002 annexation (in which the city took in six square miles of the fire-protection district), the taxpayers located in the latest proposed annexation area likely would be subject “to paying additional monies without receiving additional services.” Id. at 1270-71. We also accepted the court’s finding that, based on the effect of the 2002 annexation, Horn Lake’s latest proposed annexation would probably “have a chilling effect on the district’s efforts to secure funding by way of donations and dues collections.” Id. As a consequence, the remaining members of the fire-protection district not annexed by Horn Lake likely would be forced “to survive on reduced funds and resources for continued protection in fire emergencies.” Id. at 1271. And finding that the chancery court relied on substantial, credible evidence in finding that the impact of annexation on the fire-protection district did not favor annexation by Horn Lake, we held no error in the chancery court’s conclusion on this factor. Id.
¶ 116. But, as Tupelo correctly points out on appeal, this particular factor in Town of Walls was not dispositive of the case. We affirmed the chancery court’s *287 decision to deny Horn Lake’s annexation petition based on the court having found the petition unreasonable, in toto, when considered under the totality of the circumstances through application of the twelve indicia. Id. at 1257-58. The only indicium the chancery court found in favor of Horn Lake’s proposed annexation was “path of growth.” Id. at 1262. Except for “natural barriers” and “effect on Minority voting,” which were found neutral, the chancery court found all other indicia weighed against annexation. Id. at 1259-70.
¶ 117. Here, no evidence was presented to the chancery court demonstrating that Tupelo’s 1989 annexation had any negative impact upon the fire-protection districts then affected thereby, or on the residents then inside or outside the areas annexed. Instead, the record illustrates the following with regard to the three fire-protection districts arguing Section 19-5-151 et seq., on appeal.

Belden Fire Protection District

¶ 118. Tupelo annexed a portion of the Belden Volunteer Fire Protection District in the 1989 annexation, and it has since been served only by the Tupelo Fire Department. A portion of the current Bel-den Fire Protection District is situated within PAA 5 and PAA 6. Belden currently is rated Class 8 based in large part on its access to Tupelo’s fire hydrants, which are located both within Belden’s district area (outside Tupelo’s current municipal limits) and alongside the adjoining Tupelo corporate limits. As attested to by Willie Payne, Belden’s fire chief, Belden is permitted to access Tupelo’s fire hydrants free of charge. If not for that access, Belden would have to obtain water from other sources, such as lakes.

Palmetto-Old Union Fire Protection District

¶ 119. A portion of the Palmetto-Old Union Volunteer Fire Protection District is situated within PAA 5 and is rated a Class 9. Like Belden, Palmetto-Old Union does not have any fire hydrants, and during its most recent flow test with the Rating Bureau, the district had to access water through one of Tupelo’s fire hydrants.

Unity Fire Protection District

¶ 120. The portion of Unity Volunteer Fire Protection District situated within PAAs 1, 2 North and 2 South, which includes Indian Hills, Deer Park, and Big Oaks subdivisions, is rated Class 10, equivalent to no fire protection, due to lack of access to water.
¶ 121. Each fire-protection district uses only volunteer firefighters, whereas each firefighter in the Tupelo Fire Department is certified as a professional firefighter, with certification received following six weeks of training at the fire academy in Jackson, including at least 1,001 hours of training, with skills tested at the end of each week. Volunteer firefighters are not required to be certified. For rating purposes, one professional firefighter is equivalent to three volunteer firefighters, due to difference in response time, training, and availability of firefighters. As explained by Larry Dean Williams, Unity’s fire chief, only those volunteer firemen who are available, i.e., not at work or otherwise engaged, are able to respond to calls, and there have been situations in which enough volunteers were not available to respond to a fire.
¶ 122. In City of Pearl, 908 So.2d at 740, involving a successful annexation effort by the City of Pearl, this Court quoted the chancery court’s opinion in pertinent part as follows:
Pearl has several fire stations closer to the proposed annexation area than the nearest volunteer fire station which serves the proposed annexation area. *288 After annexation the proposed annexation area takes Pearl’s Superior Class 5 rating, rather than its present Class 10, an unprotected and the worst rating in the state. The availability of water, and a professional fire fighting department will clearly enhance the safety of the proposed annexation area. The existing population density, and the likely continued growth pattern, clearly establish a need for municipal level fire protection. The fact that tragedy has not occurred does not guarantee that it never will.
¶ 123. Unlike in Town of Walls, substantial and credible evidence was presented here to support the chancery court’s finding that the Tupelo Fire Department provides a superior level of fire protection than the fire-protection districts are capable of providing. As to whether the land owners and the residents inside the PAAs will be double-taxed or not, the fire-protection districts have no standing to argue such a claim. Fid. & Guar. Ins. Co. v. Blount, 63 So.3d 453, 467 (Miss.2011). We also decline to take into consideration Lee County’s contention(s) as to what its political officials may or may not do post-annexation.
VI. COSTS
¶ 124. The chancery court ordered that “costs, being $95.00 for filing fee and $2,491.32 for publication cost[s], be taxed in accordance with [Mississippi Code Section] 21-1-35 [ (Rev.2007) ], as follows: 30% taxed to [Tupelo]; 40% taxed to Lee County; 20% taxed to City of Saltillo; and 10% taxed to Town of Plantersville.” Lee County contends that the chancery court erred in assessing it forty percent of the publication costs, because the expense associated with the publication of notice of a hearing on an annexation petition is not within the meaning of “costs,” as governed by Rule 54(d) of Mississippi Rules of Civil Procedure.
¶ 125. We find no error in the chancery court’s order of costs. Section 21-1-35 states as follows:
In the event no objection is made to the petition for the enlargement or contraction of the municipal boundaries, the municipality shall be taxed with all costs of the proceedings. In the event objection is made, such costs may be taxed in such manner as the chancellor shall determine to be equitable pursuant to the Mississippi Rules of Civil Procedure. In the event of an appeal from the judgment of the chancellor, the costs incurred in the appeal shall be taxed against the appellant if the judgment be affirmed, and against the appellee if the judgment be reversed.
Miss.Code Ann. § 21-1-35 (Rev.2007).
¶ 126. Rule 54(d) does not expressly define what constitutes costs; rather, the rule provides our trial courts the discretion to shift costs in appropriate cases. The rule states in part: “Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs_” M.R.C.P. 54(d). The comment to Rule 54(d), however, provides some guidance on what constitutes costs:
Three related concepts should be distinguished in considering Rule 54(d): These are costs, fees, and expenses. Costs refers to those charges that one party has incurred and is permitted to have reimbursed by his opponent as part of the judgment in the action. Although costs has an everyday meaning synonymous with expenses, taxable costs under Rule 54(d) is more limited and represents those official expenses, such as court fees, that a court will assess against a litigant. Costs almost always amount to less than a successful liti *289 gant’s total expenses in connection with a law suit and their recovery is nearly always awarded to the successful party. See Miss.Code Ann. § 11-53-27 (1972) (successful party to recover costs, generally).
Fees are those amounts paid to the court or one of its officers for particular charges that generally are delineated by statute. Most commonly these include such items as filing fees, clerk’s and sheriffs charges, and witnesses’ fees. In most instances an award of costs will include reimbursement for the fees paid by the party in whose favor the cost award is made.
Expenses include all the expenditures actually made by a litigant in connection with the action. Both fees and costs are expenses but by no means constitute all of them. Absent a special statute or rule, or an exceptional exercise of judicial discretion, such items as attorney’s fees, travel expenditures, and investigatory expenses will not qualify either as statutory fees or reimbursable costs. These expenses must be borne by the litigants. 10 Wright & Miller, [Federal Practice and Procedure, Civil] § 2666 [(1973)]. See also 6 Moore’s Federal Practice ¶¶ 54.01-.43 (1972).
M.R.C.P. 54 cmt.
¶ 127. Sections 21-1-15 and 21-1-31 require notice by publication in annexation proceedings. Mississippi Code Section 25-7-65 (Rev.2010) delineates the fees that printers and publishers may charge for such publieation(s). These fees, in our opinion, constitute official expenses in this instance, by virtue of Sections 21-1-15, 21-1-31, and 21-1-35. See Miss Code Ann. §§ 21-1-15 to 21-1-31 and 21-1 -35 (Rev. 2007). And based on the language set forth by Rule 54(d), the chancery court had the discretion to assess these expenses in the manner so ordered. Accordingly, we find this issue is without merit.
CONCLUSION
¶ 128. Because the chancery court’s findings were based on substantial, credible evidence, were not manifestly wrong, and were well within the chancery court’s discretion, and because the chancery court did not employ an erroneous legal standard, we affirm the decision of the Chancery Court of Lee County.
¶ 129. AFFIRMED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ, RANDOLPH, KITCHENS, CHANDLER AND KING, JJ„ CONCUR. LAMAR, J., NOT PARTICIPATING.

. Court approval of Tupelo’s last annexation occurred in 1990, and Tupelo’s municipal limits effectively doubled in size, to approximately 51.2 square miles. Because the parties and the chancery court frequently refer to the last annexation as the 1989 annexation, so shall we.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Experts who were offered and admitted without opposition were Carl Scherff, land surveying; Pat Falkner, urban and regional planning; Kim Hanna, municipal finance; Lynn Norris, municipal finance and municipal bonds; Bret Brooks, engineering; Johhny Timmons and Greg Reed, municipality utility services; Thomas Walker, fire protection services; Tony Carleton, law enforcement; William S. Russel, public work services.

. According to the transcript, the same legal counsel representing Lee County, and arguing Daubert in the instant matter, hired Fernandez as an expert in the Byram case.

. Chris Watson testified as an expert for Lee County in the instant case.

. Evidence showed that following Tupelo’s 1989 annexation, when Tupelo doubled its *279 size by annexing approximately twenty-four square miles, it had approximately $2.2 million in its unreserved fund balance. Despite never having formally adopted any estimate of anticipated costs associated with annexation prior to approval of the 1989 annexation, following its approval, Tupelo furnished to the PAAs in a timely manner water and sewer service through the issuance of general obligation bonds, without any increase in ad valo-rem taxes or user rates.

. Tupelo has a bond rating of AA+ + + by Moody’s. No other municipality in the State of Mississippi has a higher bond rating; only the State itself has a higher rating. Testimony was presented that Tupelo presently is using only four percent of its bonding capacity. Due to its financial strength, Tupelo typically pays for equipment purchases from its general fund instead of having to finance them.

. This rating is based on the Mississippi State Rating Bureau. According to testimony from Ty Windham, superintendent of the Public Protection Department of the State Rating Bureau, Class 1 is the best rating and Class 10 is the worst. Mississippi has no Class 1 rated fire department. Typically, the higher the class number, the higher the premium for fire insurance.

. See issue four, infra, for our discussion of this legal issue.

. These numbers are obtained from the 2000 census and field reconnaissance (December 2007-March 2008).

.Lee County and the fire protection districts contend that a total of seven fire-protection districts will be impacted by Tupelo’s annexation, to wit:
(1) Belden Fire Protection District;
(2) Birmingham Ridge Fire Protection District;
(3) Unity Fire Protection District;
(4) Mooreville-Eggville Fire Protection District;
(5) Greater Plantersville Fire Protection District;
(6) Greater Verona Fire Protection District; and
(7)Palmetto-Old Union Fire Protection District.

. According to Lee County, a "4 mill tax" is levied against all taxable property within the boundaries of each respective district in order to provide support for each of the fire protection districts.

. Section 19-5-151 states in part:
(1) Any contiguous area situated within any county of the state, and not being situated within the corporate boundaries of any existing municipality, and having no adequate *285 water system, sewer system, garbage and waste collection and disposal system, or fire protection facilities serving such area, may become incorporated as a water district, as a sewer district, as a garbage and waste collection and disposal district, as a fire protection district, as a combined water and sewer district, as a combined water and garbage and waste collection and disposal district, as a combined water and fire protection district, or as a combined water, sewer, garbage and waste collection and disposal and fire protection district, in the manner set forth in the following sections.
Miss.Code Ann. § 19-5-151 (Supp.2011).

. Section 19-5-165 states in part:
(1) Beginning on the date of the adoption of the resolution creating any district, the district shall be a public corporation in perpetuity under its corporate name and shall, in that name, be a body politic and corporate with power of perpetual succession.
Miss.Code Ann. § 19-5-165 (Rev.2003).

. Section 19-5-175 states in part:
Districts created under the provisions of Sections 19-5-151 through 19-5-207 shall have the powers enumerated in the resolution of the board of supervisors creating such districts but shall be limited to the conducting and operating of a water supply system, a sewer system, a garbage and waste collection and disposal system, a fire protection system, a combined water and fire protection system, a combined water and sewer system, a combined water and garbage and waste collection and disposal system, or a combined water, sewer, garbage and waste collection and disposal and fire protection system; and to carry out such purpose or purposes, such districts shall have the power and authority to acquire, construct, reconstruct, improve, better, extend, consolidate, maintain and operate such system or systems, and to contract with any municipality, person, firm or corporation for such services and for a supply and distribution of water, for collection, transportation, treatment and/or disposal of sewage and for services required incident to the operation and maintenance of such systems. As long as any such district continues to furnish any of the services which it was authorized to furnish in and by the resolution by which it was created, it shall be the sole public corporation empowered to furnish such services within such district.
Miss.Code Ann. § 19-5-175 (Rev.2003).

. According to the record, of the three fire-protection districts participating in this appeal, the Belden Fire Protection District is rated a Class 8; the Palmetto-Old Union Fire Protection District is rated a Class 9; and the Unity Fire Protection District is rated a Class 10.

. On appeal, Tupelo asks this Court to take judicial notice that the Tupelo Fire Department has since been upgraded to Class 4. We decline to do so, since the evidence before the chancery court demonstrated a Class 5 rating.